Docket No. 86376–Agenda 27–May 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. VICTOR PEREZ, Appellant.

Opinion filed February 17, 2000.

CHIEF JUSTICE HARRISON delivered the opinion of the court:

Following a bench trial in the circuit court of Kane County, defendant, Victor Perez, was found guilty of first degree murder (720 ILCS 5/9–1(a) (West 1994)) stemming from the shooting death of Pedro Gonzalez. The conviction was based on a theory of accountability. 720 ILCS 5/5–2(c) (West 1994). Defendant was sentenced to 20 years’ imprisonment. The appellate court affirmed defendant’s conviction in an unpublished order. No. 2–96–0744 (1998) (unpublished order under Supreme Court Rule 23). We allowed defendant’s petition for leave to appeal (177 Ill. 2d R. 315(a)), and we now reverse defendant’s conviction.

The evidence presented at trial showed, in relevant part, that on February 14, 1995, around 9 p.m., the victim, Pedro Gonzalez, was walking home from a gym in Elgin with his brother Angel Gonzalez and his friend Eduardo Corral. As they were walking, a green car pulled up beside them. Several persons exited the car, including Anthony Rivera and Luis Nieves, both admitted members of the Maniac Latin Disciples street gang (Disciples). The Disciples and the Latin Kings (Kings) are rival gangs. There was conflicting testimony as to the events that occurred next.

Angel Gonzalez, a State witness, testified that as Rivera and Nieves exited the car they asked “[w]ho is a King?” and accused Pedro of displaying King hand signs. Angel stated that defendant drove by in his car, was hailed by Rivera, turned around and parked behind the green car. As defendant exited his car and approached the group, he was asked by Rivera and Nieves if Pedro was a King. According to Angel, defendant pointed at Pedro and said “yes, he’s [Pedro’s] a King” three times. Angel added that defendant “pointed the finger and said my brother and he made a gang sign.” However, when the prosecutor asked Angel to describe exactly what defendant did, Angel responded: “He pointed his finger.” On cross-examination, Angel stated he did not know whether defendant said Pedro was a King once, twice or three times, “but for me it was several times I heard.”

Angel testified that about two minutes after defendant’s statement he heard five or six gunshots. Angel did not know who fired the shots and did not see a weapon. Angel testified that defendant was present at the time of the shooting and that afterwards, he saw defendant run to his car, get in and speed away. Angel stated that defendant left “screaming.” Angel claimed that neither he nor Pedro was a member of the Kings on the day of the shooting, but that both had been members in the past. Angel believed that defendant used to be a King, but that on February 14, 1995, he was a member of the Disciples.

Angel further testified that about a week before the shooting, Rivera and Nieves were in the same green car and followed him and Pedro as they walked, flashing gang signs at the brothers. Angel stated that he and Pedro did nothing in response. Then, on the day before the shooting, he and Pedro were again followed by Rivera and Nieves in the green car, displaying Disciple gang signs. Angel thought that Rivera and Nieves were trying to start a fight, and believed that nothing happened that day because he and Pedro were in front of a police station. Angel added that, that same day, Pedro had run home and reported to Angel that he was being chased by the same men in the green car. The defendant was not present on any of these occasions.

Eduardo Corral, also testifying for the State, stated that on the day of the shooting five individuals, including Rivera, got out of a green car and were looking for Pedro. According to Corral, the group told Pedro to stop displaying King signs. Corral further testified that, at some point, defendant pulled up in his car, got out, and joined the group. Corral did not know defendant. Corral stated that someone told Pedro that they had seen him “throwing the crown up,” which meant he was identifying himself as a King. Corral testified that Pedro denied doing this, but “Coco say yes, I’m sorry man, you just did it.” Corral stated that he did not see Coco in the courtroom, and identified People’s Exhibit 18, a photograph of Luis Nieves, as Coco. When Corral became aware that Coco was defendant’s nickname, he admitted that he was “confused.” He was then allowed, over defense objection, to repeat his testimony. Corral then stated that Pedro said to defendant, “Right, Coco? I didn’t do it [display King gang signs], you know,” and defendant responded, “I’m sorry, man, but you did, you know.” Someone then yelled “cops” and Pedro began to run. Corral testified that Rivera asked Pedro why he was running and then shot him. Corral also testified that several days before the shooting, he and Pedro were chased by Rivera and another individual, whom Corral did not see at the murder scene.

While Corral stated that about four minutes passed between defendant’s statement and the time someone yelled “cops,” on cross-examination, Corral testified that the period between the two statements was a short time, “[a]lmost right away.” Corral further stated that Rivera pulled his gun very quickly and that there was no time for anyone to say, “don’t shoot.” Corral also testified on cross-examination that he did not see anyone motion to defendant as his car passed by, nor did he hear anyone whistle at defendant. Corral stated that no one flashed any gang signs after defendant arrived on the scene. Corral admitted that, at the time of the incident, he told a police officer that a man referred to as “Coco” had pointed to Pedro and said “he’s the Latin King.”

Detective James Lullo testified for the State, over defendant’s objection, as a gang expert. Lullo stated that he had been a police officer for 11 years and had worked with street gangs for about eight of those years. Lullo testified that he was a certified gang specialist assigned to the Elgin police department gang unit. He stated that he had a working knowledge of Elgin’s street gangs and was familiar with members of both the Disciples and Kings. According to Lullo, every gang has an “underlying criminal intent” which is carried out by its members. Generally, members of opposite gangs do not socialize with each other. Lullo explained that, on the day of the shooting, the Disciples and Kings were at war, which meant that rival gang members fought and shot at each other. Lullo admitted that characterizing someone as a full gang member was a “subjective call” involving factors such as the individual’s self-admission to gang membership, the presence of gang tattoos, “hanging” in gang territory, associating with other gang members, using gang signs and expressions, and being involved in crimes with other gang members.

Detective Lullo testified that, in his opinion, defendant was an associate member of the Disciples. An associate member is one who sometimes “hangs” with members of a gang in a specific neighborhood. Associate members are not constantly in the neighborhood, but display hand signs and understand the knowledge and structure of the gang. Detective Lullo believed defendant was an associate member of the Disciples based upon several incidents which had occurred in the six months prior to the shooting. Lullo testified that one incident involved a traffic altercation between defendant and a member of the Kings “where they were crashing each other and shooting.” In another instance, defendant was at a street fair with eight members of the Disciples, during which time the Disciples had a physical altercation with the Kings where shots were fired.

On cross-examination, Lullo testified that he was not the investigating officer in the traffic incident involving defendant and a King. Upon reviewing the report prepared on the incident, Lullo noted that it indicated defendant was driving his car when he was hit by an intoxicated driver who did not stop. Defendant then chased the car that hit him, which was driven by a gang member. Lullo conceded that having an accident with a gang member does not make one a gang member. Lullo also admitted on cross-examination that defendant was seen at the street fair in the company of five known Disciples, not eight, and that those five wore gang colors and represented themselves as Disciples. Defendant was not wearing gang colors and did not represent himself as a gang member.

Lullo further testified that defendant, on numerous occasions, was observed in the Disciple neighborhood associating with gang members. On cross-examination, Lullo admitted that defendant’s home is located in the Disciple neighborhood. On redirect, Lullo stated that defendant was involved in another incident where he was driving a car with two passengers when shots were fired at them. On re-cross-examination, Lullo admitted defendant’s companions were not associated with a gang and that all three told police they did not know why they had been shot at because they were not gang members. Moreover, Lullo conceded that defendant has never admitted to being a gang member, wears no tattoos, and is not known to have ever attended a gang meeting.

At the close of the State’s case, defendant moved for a directed verdict. The trial court heard arguments on the motion and denied it. Defendant then presented his defense.

Juan Carrizales, called as a defense witness, testified that he and defendant were close friends. On February 14, 1995, around 8:15 p.m., defendant picked him up and they went to get something to eat. Defendant was not wearing gang colors. According to Carrizales, as defendant was driving him home around 9 p.m., he made an unexpected left turn, double parked the car and got out. Carrizales stated that he did not leave the car and did not see where defendant went. Carrizales testified that after about a minute, defendant returned to the car and, as defendant was getting in, Carrizales heard about four or five gunshots. Defendant and Carrizales then left. On cross-examination, Carrizales stated that he was a member of the Disciples, but that defendant was not. Carrizales testified that he never told the police that he was at the scene of the shooting because he did not want to get involved. It was not until defendant’s attorney spoke to Carrizales that he disclosed this information.

Defendant testified on his own behalf. He stated that on February 14, 1995, he left his house to pick up Carrizales and get something to eat. As he was taking Carrizales home, he saw a group of individuals, one of whom he believed to be Luis Nieves. Defendant testified that he owed Nieves $20 and wanted to repay him. Defendant had known Nieves for about a year and a half and knew Nieves was a member of the Disciples. Defendant stated that he quickly turned the car around, double parked and left the vehicle with the engine running. Carrizales remained in the car.

Defendant testified that as he approached the group, someone said, “hey, Coki [Coco], isn’t it true that I’m not a King?” At first, defendant did not recognize the speaker, but after looking at him closely, defendant realized he was Pedro Gonzalez. Defendant replied, “I know you were, but I don’t know if you are.” Defendant testified that Pedro was one of his first friends when he moved to Elgin from Puerto Rico at age 12. About a year later, Pedro became a member of the Kings, but defendant did not join. Defendant testified that he had not seen Pedro for several years prior to the night of the shooting. After defendant’s brief conversation with Pedro, Angel whispered to Pedro and Pedro began to walk quickly away. Defendant stated that Pedro now looked scared, although he had not when he asked defendant the question. Nieves and defendant also began to walk away. According to defendant, as he was getting into his car he heard shots. He then entered his vehicle and left the scene.

Defendant testified that he did not see who fired the shots and that he did not know that he would be marking Pedro for trouble when he answered Pedro’s question. Defendant stated that he thought that they were trying to resolve a problem because, when he got there, “everything was normal.” Defendant testified that he had no idea there was going to be a shooting or that anyone was armed. All he did was answer Pedro’s question truthfully. He did not know Anthony Rivera, nor had he ever spoken to him, although he had seen Rivera around the neighborhood.

Defendant further testified that he was not a member of the Disciples; had not told anyone that he was a member of the Disciples; had never received any tattoos marking him as a member of the Disciples; and had never attended any meeting of the Disciples. He did testify, however, that he lived in a Disciple neighborhood, and understood that Kings and Disciples are enemies. Defendant added that it is sometimes dangerous to be around gang members and that fights break out between rival gangs. Defendant had friends in both gangs and stated that his friends “know that I don’t like any trouble.” Defendant admitted that if Pedro was a member of the Kings on February 14, 1995, he was in trouble. However, defendant denied saying Pedro “is a King,” stating: “I said he was a King. That about now I don’t know if he is.” Defendant also denied ever pointing at Pedro or accusing him of “throwing up the crown.” Defendant did not pay Nieves the $20 and did not report the shooting.

At the conclusion of the trial, the court found defendant guilty of first degree murder on a theory of accountability. At sentencing, defendant moved to reopen the case and present newly discovered evidence. The court granted defendant’s motion, vacated the finding of guilty and judgment of conviction, and allowed defendant to present additional witnesses.

Anthony Rivera, the first additional witness to testify on behalf of defendant, stated that he pleaded guilty to the murder of Pedro Gonzalez and was serving a 35-year sentence. Rivera testified that, the day before the shooting, he had an altercation with Pedro wherein Pedro indicated that he was a King by displaying hand signs. Rivera chased him for several minutes, but did not catch him. On the day of the shooting, Rivera testified, he approached Pedro and asked him why he had displayed King signs. Pedro repeatedly said that he was not a King. Rivera stated that he asked Nieves whether Pedro was a King, and Nieves told him that Pedro was a King. Pedro turned to run and Rivera shot him. Rivera testified that he did not discuss his intention to shoot Pedro with anyone. He did not take the gun from his waistband until Pedro began to run. Rivera did not pay any attention to defendant, who may have been among the group of people at the scene. Rivera stated that while he had seen defendant driving around Elgin, he did not know defendant and had never spoken to him.

On cross-examination, Rivera testified that he is a member of the Disciples, but that defendant is not. Rivera stated that he was testifying on defendant’s behalf because, “I’m not going to take an innocent person down with me.” Rivera indicated that he had acted alone in shooting Pedro and that defendant was in no way responsible for Pedro’s death.

Luis Nieves next testified on behalf of defendant. Nieves stated that he pleaded guilty to the voluntary manslaughter of Pedro Gonzalez and was sentenced to six years’ imprisonment. Nieves testified that on February 14, 1995, he, Rivera, and another individual saw three persons whom they recognized as Kings. Nieves said that Rivera began arguing with Pedro about Pedro’s gang affiliation. Nieves told Rivera that Pedro was a King. Nieves stated that defendant arrived on the scene as Pedro began to run. He did not know why defendant was present and did not hear any conversation between Pedro and defendant. According to Nieves, as defendant was approaching, Rivera shot Pedro. Nieves testified that he did not know Rivera had a gun. After the shooting, Nieves did not see defendant. Nieves stated that he was a member of the Disciples in February 1995, but defendant was not a member or an associate of the gang. At the conclusion of his testimony, the trial court questioned Nieves about whether he had ever loaned defendant money. Nieves confirmed that he had loaned defendant ten or twenty dollars and that the debt was outstanding at the time of the shooting.

Finally, Lieutenant Scott Davis of the Elgin police department testified for the defense. Davis, who had been the assistant to the chief of internal affairs for about six months, testified that Detective Lullo was currently under investigation for two separate incidents of misconduct. One investigation involved inaccuracies in Detective Lullo’s time sheets. The other involved allegations of incorrect statements on a search warrant. Davis indicated that both internal investigations were pending and that no discipline had been issued against Detective Lullo.

At the close of the new evidence, the trial court again found defendant guilty of first degree murder. The trial court held that, despite the new evidence, the State had proven the case against defendant beyond a reasonable doubt on an accountability theory.

On direct appeal, the appellate court affirmed. No. 2–96–0744 (1998) (unpublished order under Supreme Court Rule 23). The court rejected defendant’s arguments that the State did not prove him guilty beyond a reasonable doubt and that the trial court abused its discretion in allowing Detective Lullo to testify concerning defendant’s gang affiliation. Defendant reiterates these arguments in this appeal.

We first address defendant’s contention that the evidence presented by the State was insufficient to prove him guilty of first degree murder, under an accountability theory, beyond a reasonable doubt. Specifically, defendant argues that the State failed to prove that he possessed the requisite intent to promote or facilitate a crime. Defendant claims that he did not share the criminal intent of Rivera and that the evidence did not show that he was engaged in a common criminal design. We agree.

“In assessing whether the evidence against a defendant was sufficient to prove guilt beyond a reasonable doubt, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” 
People v. Taylor
, 186 Ill. 2d 439, 445 (1999); 
People v. Batchelor
, 171 Ill. 2d 367, 376 (1996). A conviction should not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant’s guilt. 
Taylor
, 186 Ill. 2d at 445; 
People v. Furby
, 138 Ill. 2d 434, 455 (1990).

In Illinois, a person is legally accountable for another’s criminal conduct when “[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense.” 720 ILCS 5/5–2(c) (West 1994); 
People v. Dennis
, 181 Ill. 2d 87, 96 (1998). To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence which establishes beyond a reasonable doubt that the defendant either: (1) shared the criminal intent of the principal, or (2) there was a common criminal design. 
In re W.C.
, 167 Ill. 2d 307, 337 (1995); 
People v. Stanciel
, 153 Ill. 2d 218, 234-35 (1992). Intent may be inferred from the character of defendant’s acts as well as the circumstances surrounding the commission of the offense. 
Stanciel
, 153 Ill. 2d at 234.

In the instant case, the State attempted to establish that defendant was a member of the Disciples, and thus must have shared Rivera’s motive to harm Pedro, whom Rivera suspected to be a member of a rival gang. However, the appellate court found only that defendant associated with members of the Disciples. Guilt by association is a thoroughly discredited doctrine. 
Uphaus v. Wyman
, 360 U.S. 72, 79, 3 L. Ed. 2d 1090, 1097, 79 S. Ct. 1040, 1045-46 (1959); see also 
People v. Bolar
, 229 Ill. App. 3d 560, 562 (1992). The fact that defendant lived in a Disciple neighborhood and had friends who were gang members does not establish that he possessed any ill-will toward Pedro. Rather, the evidence presented at trial suggested that defendant did not share Rivera’s motive to harm Pedro, where it was uncontradicted that while Pedro was defendant’s childhood friend, Rivera and defendant had never even spoken to each other. Therefore, we conclude that defendant did not share the criminal intent of the principal, Rivera.

We must next determine if the intent requirement of the accountability statute was satisfied by defendant’s participation in a common criminal design. The common design rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. 
W.C.
, 167 Ill. 2d at 337. Words of agreement are not necessary to establish a common purpose to commit a crime. 
People v. Taylor
, 164 Ill. 2d 131, 141 (1995). Accountability may be established through a person’s knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself. 
W.C.
, 167 Ill. 2d at 338. Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant’s legal accountability. 
Taylor
, 164 Ill. 2d at 141. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. 
Taylor
, 164 Ill. 2d at 141.

However, mere presence of a defendant at the scene of a crime does not render him accountable for the offense. 
Taylor
, 164 Ill. 2d at 140. Moreover, and significant here, this court has recently stressed that presence at the commission of the crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability. 
Taylor
, 186 Ill. 2d at 449; 
People v. Shaw
, 186 Ill. 2d 301, 323 (1998); 
Dennis
, 181 Ill. 2d at 108. Accountability focuses on the degree of culpability of the offender and seeks to deter persons from 
intentionally
 aiding or encouraging the commission of offenses. 
Dennis
, 181 Ill. 2d at 105. Thus, “[u]nless the accomplice 
intends
 to aid the commission of a crime, no guilt will attach.” (Emphasis in original.)
 Shaw
, 186 Ill. 2d at 322.

Applying these principles to the facts of the instant case, we find that while defendant was present at the scene of the crime, knew of its commission and fled the scene, the evidence was not sufficient to prove that he intentionally aided in or encouraged the crime’s commission. We reject the trial court’s reasoning that, because defendant sometimes associated with members of the Disciples, he must have known that by answering the question about Pedro’s gang status, he was precipitating Pedro’s shooting. While defendant testified, in hindsight, that if Pedro were a King on February 14, 1995, he was in trouble, he also testified that, 
at the time he answered the question
, he did 
not
 know Pedro was in trouble. This claim is supported by the uncontested evidence that, when defendant answered the question about Pedro’s gang status, he did not know of the ongoing dispute and prior altercations between Rivera and Pedro, he did not know that Rivera, or anyone at the scene, was armed, and he did not see any signs of impending violence.

In order to hold defendant accountable for Pedro’s murder, defendant must have, with the requisite intent, aided or abetted Rivera prior to or during the commission of the offense. See 
Dennis
, 181 Ill. 2d at 96. Without knowledge of any common criminal design to harm Pedro, defendant could not intentionally aid in the scheme’s commission. See 
People v. Estrada
, 243 Ill. App. 3d 177 (1993) (in the absence of any evidence that defendant was aware that his companion intended to shoot the victim or direct evidence tying defendant to a common design to shoot the victim, defendant’s murder conviction on a theory of accountability was reversed); 
People v. Taylor
, 219 Ill. App. 3d 47 (1991) (State failed to prove that defendant knowingly participated in a common scheme to commit illegal acts where he drove around with friends who, without a plan, dropped concrete from an overpass, killing a motorist; defendant’s involuntary manslaughter conviction based on accountability reversed).

We conclude that, despite the deference given to the State on review, no rational trier of fact could have found beyond a reasonable doubt that defendant had the intent to promote or facilitate Rivera’s commission of the offense of first degree murder. Accordingly, we hold that the appellate court erred in concluding that there was sufficient evidence upon which a factfinder could have based defendant’s conviction for first degree murder under the theory of accountability. See
 Taylor
, 186 Ill. 2d at 449. Because we reverse defendant’s conviction, we need not reach the issue he raises concerning the propriety of Detective Lullo’s testimony.

For the aforementioned reasons, we reverse the judgments of the appellate and circuit courts.

Judgments reversed
.

JUSTICE RATHJE took no part in the consideration or decision of this case.