NOTICE
Decision filed 06/15/17. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2017 IL App (5th) 140575

NO. 5-14-0575

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 14-CF-25 |
| | ) | |
| ALBERT D. CHURCH, | ) | Honorable |
| | ) | Allan F. Lolie, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Justices Cates and Barberis concurred in the judgment and opinion.

**OPINION**

¶ 1     After a stipulated bench trial in the circuit court of Effingham County, defendant, Albert D. Church, was convicted of unlawful delivery of a controlled substance (heroin) under an accountability theory (720 ILCS 570/401(d)(i) (West 2012)) and sentenced to three years and six months in the Department of Corrections to be followed by two years of mandatory supervised release. The issues raised on appeal are (1) whether defendant was proven guilty of delivery of a controlled substance by accountability beyond a reasonable doubt and (2) whether defendant knowingly and voluntarily waived his right to a jury trial. We affirm.

1

¶ 2 BACKGROUND

¶ 3 Jessica James, age 29, died as the result of a heroin overdose on February 5, 2014. Jay Miller (Jay), defendant's roommate, sold the heroin to James on February 4, 2014. On February 12, 2014, defendant was charged by information with one count of delivery of a controlled substance on a theory of accountability after a police investigation revealed that defendant was involved in arranging the heroin purchase between James and Jay. Defendant was later charged by indictment with the same count. Defendant entered a written plea of not guilty and a demand for a speedy trial.

¶ 4 On June 27, 2014, the State filed a second count, charging defendant with criminal drug conspiracy (720 ILCS 570/405.1 (West 2012)). On August 28, 2014, defendant stated on the record that he waived his right to a jury trial as he simultaneously signed a waiver. The prosecutor stated that as "part of the consideration that [defendant] used in waiving his jury trial right was that the People were going to dismiss Count 2, and the trial before your Honor will solely be on Count 1." On September 17, 2014, the case proceeded via a stipulated bench trial.

¶ 5 Defendant admitted that his roommate, Jay, supplied heroin to James. The only point of contention during the stipulated trial was whether defendant was accountable for Jay's delivery of the heroin to James. The State submitted six exhibits.

¶ 6 People's Exhibit 1 contains the stipulated facts. People's Exhibit 2 is a series of screen shots of Facebook conversations between a Facebook account in the name of Jessica James and an account in the name of defendant. People's Exhibit 3 shows

2

incoming and outgoing calls and text messages from defendant's phone and includes communications between him, James, Jay, and Jay's girlfriend, Tomeka Price. People's Exhibit 4 is a map of central Illinois between Effingham and Decatur and shows the digital pinging of Christopher Miller's (Christopher) phone between the two cities on February 4, 2014. Christopher gave a stipulated statement that he and Jay (no relation) went to Decatur on February 4, 2014, purchased heroin, and then returned to Effingham. People's Exhibit 5 is the transcript of defendant's interview with police that took place on February 7, 2014. People's Exhibit 6 is a DVD copy of the interview.

¶ 7    The State introduced Facebook conversations that took place between defendant and James, dating back to April 2013. Several of the conversations revolve around James's attempts to procure drugs. For example, in July 2013, the following conversation occurred between defendant and James:

> "[James:] can u get anything? Like pills, etc?
>
> [Defendant:] hold on let me ask some ppl
>
> [James:] omg please
>
> [Defendant:] wait what kind lol
>
> [James:] dros
>
> or anything reall[y]
>
> vikes
>
> downers
>
> [Defendant:] right on I just didn't know up or down
>
> [James:] yep down

or h possibl? Ahh need something

do u still have my number also?

217-825-***

[Defendant:] yea I lost it when I got a new phone

[James:] whats your new one

[Defendant:] 217-663-***

Well the two ppl that responded 2 me cant get anything☹

[James:] i know... i cant find anyone either

Well let me know if u do please

[Defendant:] i will fo sho"

During his interview with police on February 7, 2014, defendant admitted that the initial "h" set forth above was short for heroin and that James was asking specifically for heroin.

¶ 8    In September 2013, James again contacted defendant via Facebook and asked, "Do u know anyone that has pills right now[?]" Defendant did not respond online to James's request. On February 1, 2014, James contacted defendant about getting drugs, and the following online conversation occurred:

"[Defendant:] yes I wont get it tonight but my buddy goes up 2 decator [*sic*]

and gets some prity [*sic*] frequently

....u lookin 4 h again?

[James:] omg I love u and yes

Ill [*sic*] be getting a big check soon

Tell him u know me I have lost all my connects it sucss [*sic*]

4

[Defendant:] I got a new phone text me your number 217 240 ***"

James then texted defendant her number and asked defendant whether he received her text.

¶ 9    The police searched defendant's cell phone pursuant to a search warrant and found a number of texts between James's phone and defendant's phone. There were also a number of telephone calls corresponding with text messages from James. Between 10 p.m. on February 1, 2014, and 12:34 a.m., there were several text messages between defendant's phone and James's phone. Many of the texts were from James, informing defendant that he was her only hope for obtaining drugs. At 11:18 p.m., defendant texted James that his drug connection "[d]oes not have the money to get it[;] you would have to pay for it." James replied that she would give him the money but would feel better going with the connection so she would not get cheated out of her money. At 12:34 a.m., James texted defendant and asked him to let her know when the contact wanted to go. At 12:37, defendant responded, "I will tomorrow."

¶ 10    At 8:42 a.m. on February 2, 2014, defendant sent a text to "Doober" and stated, "Hey what's up man? Do you know where I could score a gram of k." At 10:34 a.m., defendant texted a phone number with a 217 area code and stated, "Hey whats up Blake this is church can I get a gram[?]" James texted defendant a few more times throughout the day in an attempt to get a drug connection through him.

¶ 11    On February 3, 2014, at 2:07 p.m., defendant sent James a phone number via text message and told her to "talk to this guy its jay." James responded, "Does he know ill [*sic*] be calling." Defendant replied, "Yes." At 8:30 p.m., James texted defendant, "I

5

texted him hvent [*sic*] heard nuthin [*sic*]." At 11:10 p.m. defendant texted James asking her if she got in contact with Jay.

¶ 12    The stipulated facts indicate that Tomeka Price had been dating Jay for a few of weeks at the time of James's death. While Price was aware Jay used heroin, she did not approve of it. Price said Jay either spent time with her or lived at an apartment with defendant. According to Price, Jay did not have a valid license, a vehicle, or a cell phone, and he frequently used her cell phone while she was at work.

¶ 13    On February 4, 2014, Price took lunch to Jay at the apartment he shared with defendant. Jay told Price he had to help a girl, which turned out to be James. Price took Jay to 507 Illinois Avenue where James exited the residence and got into Price's car. Price drove James and Jay to a bank. James entered the bank alone and returned a short time later.

¶ 14    Bank records show James withdrew $50 from her account. James did not have sufficient funds, so the bank accepted a counter check after James agreed to pay an overdraft fee. The counter check was time stamped at 2:15 p.m. After James exited the bank, Price drove James and Jay back to James's residence. Jay and James went inside the house. While Price was waiting for Jay to return, she received a text from defendant, asking her to take him to work. Price complied. When she returned to James's house, Jay exited, and he was sweating. From past experience, Price knew Jay sweated when he used heroin.

¶ 15    The stipulated facts show that Christopher would testify that text messages on his phone from Tomeka Price's phone were actually communications between him and Jay. Christopher drove Jay to Decatur numerous times to buy heroin because Jay did not have a driver's license. Christopher drove Jay to Decatur to purchase heroin on February 4, 2014. Christopher saw the heroin Jay purchased. Christopher had a previous conviction for heroin delivery with a pending petition to revoke probation and a pending charge of home invasion. For his cooperation with the case against defendant, the State promised Christopher the minimum sentence for a guilty plea in the home invasion case.

¶ 16    The police interviewed defendant on February 7, 2014, after James died. After police showed defendant Facebook messages and text messages, defendant acknowledged that he gave James the phone number of a guy who travels to Decatur to purchase drugs. Defendant refused to identify the purchaser of the heroin. Defendant said the police could look at his phone and figure it out, but he did not want to be "a snitch." Officer Stephens specifically asked defendant, "So how did you hook her up to the guy? If you didn't go along how did you hook her up to him?" Defendant replied, "I called the guy, I called [James] and told her who to call." Later in the interview defendant specifically stated, "Well, I was involved because I introduced [James] to a heroin dealer."

¶ 17    After considering the stipulated evidence, the trial court found defendant guilty beyond a reasonable doubt of delivery of a controlled substance by accountability. Defendant filed a motion for acquittal or, in the alternative, a new trial. The trial court denied the motion. The parties made a joint sentencing recommendation of three years

7

and six months in prison. The trial court sentenced defendant to that amount of time to be followed two years mandatory supervised release. Defendant now appeals his conviction.

¶ 18                              ANALYSIS

¶ 19                       I. Sufficiency of the Evidence

¶ 20    The first issue raised on appeal is whether defendant was proven guilty of delivery of a controlled substance by accountability beyond a reasonable doubt. Defendant contends the evidence was insufficient to prove beyond a reasonable doubt that he aided, abetted, solicited, agreed, or attempt to aid another in the commission of the crime. He further contends the State failed to prove he possessed the concurrent, specific intent to promote or facilitate the commission of the offense. We disagree.

¶ 21    Where, as here, a defendant argues that the evidence was insufficient to sustain his conviction, the question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, it is not our job to retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the function of the finder of fact to assess the credibility of the witnesses, weigh and resolve any conflicts in the evidence, and draw reasonable conclusions from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 22    In the instant case, defendant was tried under the theory that he was accountable for the actions of Jay, who sold James the heroin that ultimately killed her. In order for a defendant to be convicted under an accountability theory, the State must prove beyond a

8

reasonable doubt that he or she (1) solicited, aided, abetted, agreed, or attempted to aid another person in the planning or the commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2012); *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 58. A defendant may be found guilty on an accountability theory if the State establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal or that there was a common design or scheme. *People v. Perez*, 189 Ill. 2d 254, 266 (2000).

¶ 23    A defendant's intent may be inferred from the nature of his or her actions and the circumstances surrounding the criminal conduct. *Id.* "Accountability focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses." (Emphasis in original.) *Id.* at 268. "Thus, '[u]nless the accomplice *intends* to aid in the commission of a crime, no guilt will attach.' " (Emphasis in original.) *Id.* (quoting *People v. Shaw*, 186 Ill. 2d 301, 322 (1998)).

¶ 24    In finding defendant guilty, the trial court specifically stated as follows:

"The Court must find beyond a reasonable doubt that Jay Miller did deliver a controlled substance, that being heroin[ ], to [James]. Based on all the evidence the Court reviewed, the Court does find that delivery, beyond a reasonable doubt did occur.

The next issue is whether this Defendant, before or during the offense with the intent to promote or facilitate this offense, knowingly solicited, aided, abetted, agreed to aid, or attempted to aid the person in the commission of the offense. That person, of course, being Jay Miller.

Defense counsel argues that this is a situation where his friend merely called him and said, help me find some heroin[ ]. And he just said he was doing a friend a favor. Of course, I'm paraphrasing.

The Defendant received no money. It's un-rebutted and stipulated for this transaction. It's also not in dispute that the Defendant never touched the heroin[ ] at issue in this case.

Had the Defendant simply told Miss James my friend has heroin[ ]. Go talk to him. I may agree with the Defendant. That may not have been enough to make him accountable. That is not the case here. The Defendant told Miss James that Jay Miller frequently had heroin[ ] and, in fact, called Jay Miller to tell him to expect Miss James's call.

The stipulated evidence in this case was that the phone calls between Defendant's phone and Miss James's phone were made by Jay Miller using Defendant's phone, and I accept that being true that that was the case. That it was actually Mr. Miller using Defendant's phone. However, I see that that does nothing to mitigate the culpability of the Defendant. The Defendant was aware that the two were engaging and arranging a delivery of a controlled substance.

10

I do find, therefore, beyond a reasonable doubt, the Defendant's actions under the statute as read, do constitute aiding, agreeing to aid, and attempting to aid Mr. Miller in the planning or commission of the offense at issue here and find him guilty of Count I, delivery of a controlled substance."

After careful consideration, we agree with the trial court's analysis.

¶ 25    The stipulated evidence showed that Jay and defendant were roommates. Jay was a known heroin addict. Defendant and James were friends who communicated not only by Facebook, but also by text. As early as April 2013, James began asking defendant to help her procure drugs, including heroin. In the days leading up to her death, James contacted defendant numerous times, seeking his help in obtaining drugs. On February 1, 2014, defendant and James participated in an online Facebook conversation during which defendant specifically asked James if she was looking for heroin. James replied, "omg I love u and yes." Defendant told James about his friend who frequently drives to Decatur for drugs. Defendant gave James his new phone number and asked James to text her phone number to his new cell number. James complied.

¶ 26    Thereafter, defendant sent James a text message in which he explained that his drug connection did not have the money to buy drugs, and the only way a deal could be worked out if was James would pay before delivery. On February 3, 2014, defendant sent James a text message in which he gave her Jay's phone number and told her to "talk to this guy its jay." James then wanted to know if Jay was aware she would be calling, and defendant said, "Yes." Later that evening, James texted defendant and said she texted

11

Jay, but she had not heard anything. A few hours later, defendant followed up with a text to James asking her whether she was able to get in contact with Jay.

¶ 27 Pursuant to the stipulated facts, Christopher confirmed he drove Jay to Decatur on the morning of February 4, 2014, where Jay purchased heroin. Jay's girlfriend, Tomeka Price, would testify that she drove James to the bank to withdraw money. Price left Jay at James's house, and when she returned, she believed that Jay had used heroin because he was sweating, which he normally did after using heroin.

¶ 28 When defendant was interrogated by the police, he refused to give the police Jay's name because he did not want to be a "snitch." However, he knew the police could determine who sold the heroin to James by looking at his phone and reviewing his text messages, phone calls, and Facebook messages. When all the evidence is considered in the light most favorable to the State, it shows that the drug transaction that ended up costing James her life could not have occurred without defendant's involvement.

¶ 29 Defendant talked to both Jay and James and arranged for James to call Jay. If defendant had not supplied James with Jay's phone number, the drug transaction would not have occurred. Contrary to defendant's assertions, his involvement goes beyond the courtesy of informing his roommate that he had given his telephone number to someone with whom he was not acquainted, and she might be calling.

¶ 30 The evidence shows James was frantic to find a drug connection. Defendant was well aware that he was connecting James and Jay for the sole purpose of James purchasing drugs, specifically heroin. Defendant admitted to police he was involved in

the crime, specifically stating, "Well, I was involved because I introduced [James] to a heroin dealer." Under these circumstances, there was sufficient evidence for any rational trier of fact to find defendant guilty.

¶ 31                                      II. Waiver of Jury Trial

¶ 32   The other issue raised by defendant on appeal is whether he knowingly and voluntarily waived his right to a jury trial. Defendant argues we should reverse and remand for a new trial because he did not make a knowing and intelligent waiver of his right to a jury trial as he only agreed to waive his right to a jury trial in exchange for the dismissal of a criminal drug conspiracy count and was not informed he could not be convicted of that count. The State replies that the benefit defendant derived from having one count dismissed was not illusory as defendant asserts; rather, defendant received a tangible benefit in exchange for his jury waiver. The State further replies that even if defendant's jury trial waiver was illusory, the record fails to show that the "concession" was the principal or motivating factor for waiving the jury.

¶ 33   Before we address the merits of this issue, we note that defendant acknowledges he waived the issue by failing to object during the trial or failing to raise the issue in a posttrial motion; nevertheless, defendant's forfeited claim is reviewable under a plain error analysis. *People v. Bracey*, 213 Ill. 2d 265, 270 (2004). However, before considering defendant's claim under a plain error analysis, we must first determine whether error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

13

¶ 34    Our federal and state constitutions both guarantee a criminal defendant's right to a trial by jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13. A defendant may waive this right by knowingly and understandingly waiving it in open court. 725 ILCS 5/103-6 (West 2012); *Bracey*, 213 Ill. 2d at 269-70. There is no specific admonishment or advice the court must provide prior to accepting a waiver. *People v. Bannister*, 232 Ill. 2d 52, 66 (2008). The effectiveness of a defendant's waiver depends on the particular facts and circumstances of each case. *Id.* The critical determination is whether the waiving defendant understood his case would be decided by a judge rather than a jury. *Id.* at 69. Whether a defendant knowingly waived his right to a jury trial is subject to *de novo* review. *Bracey*, 213 Ill. 2d at 270.

¶ 35    In support of his contention that he did not knowingly waive his right to a jury trial, defendant specifically relies on *Bracey*. In *Bracey*, the defendant knowingly waived his right to a jury trial after extensive admonishments by the trial court. *Id.* at 267. Following a trial, the trial court granted the defendant's motion for a new trial. *Id.* at 267-68. Before the defendant's second trial, the court announced it was ready to begin a second bench trial, and neither the defendant nor his attorney objected. *Id.* at 272-73. Our supreme court reasoned that the defendant's initial waiver ended with the first trial, and he was erroneously led to believe his initial waiver obligated him to a bench trial in the second trial. *Id. Bracey*, therefore, stands only for a limited proposition that when a defendant is retried, he must make a new waiver of his right to a jury trial. *People v. Reed*, 2016 IL App (1st) 140498, ¶ 10. Because the instant case does not present a retrial situation, defendant's reliance on *Bracey* is misplaced.

¶ 36 Additionally, we are unconvinced by defendant's argument that he received no benefit from having one of the charges dropped. Even though defendant could not have been *convicted* of both the inchoate offense (criminal drug conspiracy) and the principal offense (delivery of a controlled substance), he could have been found *guilty* of one or both of the charges. The charges, while similar, are not identical. See 720 ILCS 570/401(d)(i), 405.1 (West 2012). As the State points out, a conflicted jury might decide to find defendant guilty of one charge and not the other. Thus, defendant's chances of an acquittal were better facing only one charge rather than two.

¶ 37 Even assuming *arguendo* that defendant received no benefit from the State dropping the criminal drug conspiracy charge, defendant has failed to convince us that he would not have waived a jury trial. In support of our determination, we first point to the prosecutor's statement on the record that the dismissal of one count was only "*part* of the consideration" defendant relied on in waiving his right to a jury trial. (Emphasis added.) Neither defense counsel nor defendant objected to that characterization.

¶ 38 Second, there are clearly benefits to having the case tried before the court rather than a jury. For example, defendant moved for a change of venue based on pretrial publicity. Defendant alleged extensive pretrial publicity prevented him from receiving a fair trial in Effingham County. Attached to that motion were 36 news articles concerning not only James's overdose, but also the resulting charges against defendant and others. In light of the trial court's denial of that motion, defendant may have considered a bench trial more advantageous because a bench trial, rather than a jury trial, would tend to reduce any prejudice caused by pretrial publicity.

15

¶ 39    Finally, the record shows the trial court specifically asked defendant whether, after consulting with his attorney, it was his desire to give up his right to a jury trial, and defendant stated on the record it was his desire. Defendant acknowledged that he was not threatened by anyone nor was he promised anything in addition to what the judge told him in order to get him to waive his right to a jury trial. As defendant was signing a jury waiver form, the trial court stated, "One other thing, sir, before you finish signing that, once you've waived your jury trial, you can't come back and say Judge, I wish I wouldn't have done that, I really want a jury trial. Do you understand that?" Defendant replied in the affirmative. Thus, the record before us clearly shows that defendant was well aware his case would be decided by a judge rather than a jury.

¶ 40    Considering defendant's waiver, his colloquy with the trial court, and the particular facts and circumstances surrounding this case, we find defendant knowingly and voluntarily waived his right to a jury trial. Because we find no error occurred, there can be no plain error. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 64.

¶ 41                                    CONCLUSION

¶ 42    For the foregoing reasons, we find sufficient evidence in the record for the trial court to find defendant guilty of unlawful delivery of a controlled substance under an accountability theory. We further find defendant's waiver of a jury trial was knowing and valid. Accordingly, we affirm the judgment of the circuit court of Effingham County.


¶ 43    Affirmed.

16

2017 IL App (5th) 140575

NO. 5-14-0575

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
|     Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 14-CF-25 |
| | ) | |
| ALBERT D. CHURCH, | ) | Honorable |
| | ) | Allan F. Lolie, |
|     Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**        June 15, 2017

_____

**Justices:**        Honorable Richard P. Goldenhersh, J.

Honorable Judy L. Cates, J., and
Honorable John B. Barberis, J.,
Concur

_____

**Attorneys**
**for**
**Appellant**

Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy Defender, Ian C. Barnes, Assistant Appellate Defender, Office of the State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle, Mt. Vernon, IL 62864

_____

**Attorneys**
**for**
**Appellee**

Honorable Bryan M. Kibler, State's Attorney, Effingham County Government Center, 120 West Jefferson, Suite 201, Effingham, IL 62401; Patrick Delfino, Director, David J. Robinson, Acting Deputy Director, Patrick D. Daly, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____