NOTICE

Decision filed 04/01/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 170222-U

NO. 5-17-0222

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Perry County. |
| | ) | |
| v. | ) | No. 16-CF-169 |
| | ) | |
| DEVHUNTE PETTY, A/K/A JOHNSON, | ) | Honorable |
| | ) | James W. Campanella, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The State presented sufficient evidence to support the trial court's finding that Devhunte Petty was guilty beyond a reasonable doubt of armed robbery via accountability.

¶ 2    Following a bench trial, defendant Devhunte Petty was convicted of one count of armed robbery via accountability. The trial court sentenced him to eight years in the Illinois Department of Corrections (IDOC) but later reduced the sentence to six years in IDOC on its own motion. On appeal, Petty raises one point challenging the sufficiency of the evidence to convict him at trial. For the following reasons, we affirm.

¶ 3                          BACKGROUND

¶ 4    The State charged Devhunte Petty with one count of armed robbery (720 ILCS 5/18-2(a)(1) (West 2016)), a Class X felony. The criminal information alleged that Petty, while carrying a BB

1

gun, knowingly took a Chicago Bulls hat from K.S. (a minor) by threatening the imminent use of force. The following evidence was adduced at Petty's bench trial.

¶ 5      On the night of December 27, 2016, into the early morning hours of December 28, 2016, K.S. received a car ride to meet his friend Z.H. (a minor) at John Woodcock's house. K.S. made arrangements for the car ride with a woman named Heaven Barton. She picked up K.S. in a white Impala being driven by Shawn Martin. K.S. sat in the back seat of the car behind the passenger. A man with a tattoo[1] was sitting in the middle of the back seat. Petty was sitting in the back seat behind the driver. When the parties arrived at Woodcock's house, Z.H. was walking toward the Impala, and everyone got out of the back seat of the Impala.

¶ 6      After K.S., Petty, and Nigia, exited the Impala, the evidence at trial showed that a robbery occurred wherein K.S.'s hat was taken at gunpoint. Z.H.'s hat, shoes, and phone were also taken. The evidence revealed only four people—K.S., Z.H., Petty, and Nigia—were outside of Woodcock's house during the robbery. Both K.S. and Z.H. provided statements to the police and testified at trial regarding the details of the robbery. K.S. and Z.H. also identified, during their interviews and at trial, the brown Chicago Bulls hat belonging to K.S. and Z.H.'s hat and shoes.

¶ 7      During the interview with K.S. at the police station, he reviewed a six-person photo lineup wherein he identified the person in position six as the man with the gun who asked for his hat. The "photo lineup key" indicates that the person in position six was "Devaunte [*sic*] Petty." K.S. told law enforcement that once he exited the car, Petty also got out and asked for cash. When K.S. and Z.H. told Petty that they did not have cash, Petty pulled a gun out of his waistband. K.S. started walking toward the house, but Nigia grabbed K.S. and pulled him toward Z.H. Nigia then went

---

[1]The man with the tattoo was referred to by K.S. and Z.H. throughout the trial as "the other dude"; however, Martin testified that his name was Nigia but could not provide his full name. For uniformity and clarity, "the other dude" will be referred to as "Nigia" throughout this order.

through Z.H.'s pockets while Petty pointed the gun at them. K.S. again walked toward the front porch. K.S. stated Petty aimed the gun at K.S.'s head and asked for his hat. Once he was on the front porch, K.S. threw his hat to Petty, and Nigia took Z.H.'s belongings.

¶ 8     K.S.'s trial testimony wavered from his statement to police on the day of the robbery. He testified that after arriving at Woodcock's house, "[w]e basically got robbed. I don't know who it was that did it but it was night time." K.S. also could not recall who held the gun: "I don't know if it was Devhunte or [Nigia]." When presented a gun at trial, K.S. identified it as the one used in the robbery. During his testimony, K.S. recounted, without being specific, that "his friend or somebody yanked my shirt." He also testified that "he wanted some money or something" and "he was trying to rob us for whatever we had." When asked what the man with the gun asked him, K.S. replied, "Well, all I heard someone told me they wanted my hat. They wanted me to give them my hat and I threw them my hat." K.S. further testified Z.H. "was getting his stuff taken by his other friend too." On cross-examination, K.S. confirmed he told defense counsel that Petty was present but did not believe Petty had anything to do with the gun or the robbery. He also affirmed he told defense counsel that Petty stood there and looked surprised.

¶ 9     During Z.H.'s interview at the police station, he also viewed a six-person photograph lineup. Z.H. could not positively identify anyone in the lineup but believed the person in position six (Petty) was the man with the gun. Z.H. confirmed that the individuals in positions one and four were not involved, and he had never seen two of the other individuals. At trial, Z.H. identified Petty as one of the men involved in the robbery. Z.H. also identified the gun used during the robbery. Z.H. testified that Petty pulled K.S. toward Z.H., and Nigia asked if they needed weed. When they declined needing weed, one of the men pulled out a gun while the other man took Z.H.'s hat, shoes, and phone. Initially, Z.H. could not recall who had the gun. During a

demonstration as to everyone's position during the robbery, Z.H. remembered that Petty held the gun while Nigia went through Z.H.'s pockets and took his belongings. Z.H. testified that K.S. ran onto the front porch, and Z.H.'s uncle came outside and stated he was calling the police. Z.H. then witnessed Petty tell K.S. to throw K.S.'s hat to Petty. After K.S. threw Petty the hat, Petty and Nigia then returned to the Impala and left. When Petty and Nigia re-entered the Impala, Martin testified they told him "go."

¶ 10    John Woodcock testified that he was sleeping inside his house when he awoke to yelling outside the residence. He went outside to tell the individuals to leave. Four individuals were outside by a car, Z.H., K.S., and two other "black kids" that he did not recognize. Woodcock returned inside until he heard the yelling begin again. He went outside with his phone and told the individuals to leave or he was calling the police. When Woodcock returned outside the second time, K.S. came onto the front porch and told Woodcock that one of the individuals had a gun. Woodcock announced he was calling the police and proceeded to do so.

¶ 11    Detective Philip Schimanski testified that he conducted an initial field interview on December 28, 2016, with K.S. and Z.H. In the field interview, K.S. and Z.H. described the individual who pointed the gun at them as wearing all black and having some facial hair. One of the individuals was also wearing a pair of Nike Air Force One shoes. At trial, Detective Schimanski identified Petty and stated that when he observed Petty at the police station on December 28, 2016, Petty was wearing all black and a pair of Nike Air Force One shoes.

¶ 12    Police Officer Scott Beasley testified that he responded to a call for "juveniles with a gun" during the early morning hours of December 28, 2016. While en route to the call, he instructed Sgt. Joshua Harsy to make an investigative stop on Martin's car because it matched the description from the call. Officer Beasley then proceeded to Sgt. Harsy's location. Sgt. Harsy testified that he

4

attempted to initiate a traffic stop on the car, but Martin quickly sped off after stopping. Martin testified that he sped off because he did not have a license and "it was a misdemeanor to run." Sgt. Harsy pursued Martin until he crashed the car into an embankment. Petty and Nigia exited the back seat of Martin's car and ran. When Officer Beasley arrived at the scene of the wreck, he testified that he saw "two black males" run from the car. Officer Beasley exited his car, yelled "stop, police," and pursued the "two black males" on foot. One of the individuals crouched behind a tree while the other continued to run. Officer Beasley ordered the man hiding behind the tree, who he identified as Petty, to get on the ground and cuffed him. He then pursued the other man while keeping Petty in sight. Officer Beasley was unable to catch the other man.

¶ 13    While Officer Beasley pursued Petty and Nigia, Sgt. Harsy detained Martin and Barton. Sgt. Harsy also took photographs of the outside and inside of the Impala and conducted an inventory of the contents. Two of the photographs depicted the rear passenger area of the Impala with various items including a brown hat, a gray hat, and blue and black shoes in the floor area of the car. After viewing the two photographs of the rear passenger area of the Impala at trial, Martin testified that he recognized some of the items, but the two hats and shoes were not his. He did not know they were in his car. When questioned about the gun found in his car, Martin testified he did not recognize the gun and knew of no reason for it to have been in his car.

¶ 14    At the close of the State's evidence, Petty moved for a directed verdict, which the trial court denied. Petty rested without presenting any evidence. After considering the evidence, the trial court concluded the State had not proven beyond a reasonable doubt that Petty was guilty of armed robbery acting as a principal. Nevertheless, the trial court found Petty guilty of armed robbery via accountability. The trial court acknowledged that K.S.'s trial testimony "sucked."

5

However, the trial court observed that "[w]hen [K.S.] got off the stand it was very evident he didn't want to be here. He didn't want to point [Petty] out. He wanted to change his stories."

¶ 15    The trial court set sentencing in the case for a later date, and Petty filed a motion for a new trial. The trial court subsequently denied Petty's motion for a new trial after a hearing and sentenced Petty to eight years in IDOC. The sentence was reduced to six years in IDOC on the trial court's own motion. This appeal follows.

¶ 16                                ANALYSIS

¶ 17    Petty challenges the sufficiency of the evidence to support his conviction for armed robbery via accountability. He argues that the State's case rested on weak and inconsistent statements of two witnesses who were uncertain as to whether Petty was involved in the armed robbery. Petty asserts that the State's evidence only showed that he "might" have participated in the robbery or that he was merely present at the scene of the robbery. We disagree.

¶ 18    A criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When presented with a challenge to the sufficiency of the evidence, the reviewing court does not retry the defendant. *Collins*, 106 Ill. 2d at 261. The relevant question is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Collins*, 106 Ill. 2d at 261. It is well settled that it is the trier of fact's responsibility to assess the credibility of the witnesses and the weight given to their testimony, to resolve conflicts or inconsistencies in the evidence, and to draw all reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). It is the reviewing court's duty to carefully examine the evidence while giving due consideration to the fact that the trier of fact saw and heard the witnesses. *People v. Smith*, 185 Ill.

6

2d 532, 541 (1999). Where the record is not such that the only inference reasonably drawn from the flaws in the testimony is disbelief of the whole, a reviewing court should be mindful that the fact finder had the benefit of observing the witnesses' demeanor. *People v. Cunningham*, 212 Ill. 2d 274, 284 (2004). Thus, the reviewing court does not substitute its judgment for that of the trier of fact. *Ortiz*, 196 Ill. 2d at 259.

¶ 19    To sustain a conviction for armed robbery, the State was required to prove beyond a reasonable doubt that Petty, while carrying a BB gun, knowingly took K.S.'s Chicago Bulls hat by threatening the imminent use of force (720 ILCS 5/18-2(a)(1) (West 2016)), or that he was accountable for another's conduct. Under Illinois law, an individual is legally accountable for another's criminal actions when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016). To prove a defendant possessed the intent to promote or facilitate an offense, the State must present evidence which establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal, or there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). Intent may be inferred from the nature of the defendant's actions as well as the circumstances surrounding the commission of the offense. *Perez*, 189 Ill. 2d at 266. Where two or more people engage in a common criminal design or agreement, any acts in furtherance of that common design or agreement committed by one party are considered to be the acts of all parties to the design or agreement. *Perez*, 189 Ill. 2d at 267. All parties to the design or agreement are equally responsible for the consequences of acts in furtherance. *Perez*, 189 Ill. 2d at 267.

¶ 20    A defendant's mere presence at the scene of a crime is insufficient to establish accountability even when joined with a defendant's flight from the scene or knowledge that a crime

7

is being committed. *Perez*, 189 Ill. 2d at 268. However, words of agreement are not required to establish a common purpose to commit an offense. *Perez*, 189 Ill. 2d at 267. Accountability may be established through an individual's knowledge of and participation in the criminal scheme, even though no evidence shows the individual directly participated in the criminal act itself. *Perez*, 189 Ill. 2d at 267. The trier of fact may consider the defendant's presence during the perpetration of the crime, the defendant's flight from the scene, the defendant's continued close affiliation with his cohorts after the commission of the crime, and the defendant's failure to report the crime. *Perez*, 189 Ill. 2d at 267. Evidence that the defendant voluntarily attached himself to a group bent on illegal acts, with knowledge of its design, also supports an inference that the defendant shared the common purpose and will uphold the defendant's conviction for an offense committed by another. *Perez*, 189 Ill. 2d at 267.

¶ 21    The evidence in Petty's trial did not show one man acting alone while the other stood idly by in surprise as Petty suggests. While K.S. and Z.H.'s testimony conflicted with each other and their prior statements, they were consistent in the fact that two men robbed them at gunpoint and both men participated in the robbery. There is no doubt that Petty was one of the men participating in the robbery. Multiple witnesses placed Petty at the scene. Both Petty and Nigia exited the Impala when they arrived at Woodcock's house. One of the men pulled K.S. over by Z.H. Either Petty or Nigia produced a gun and pointed it at K.S. and Z.H. While one of the men pointed a gun at K.S. and requested his hat, the other man did not stand there merely present at the scene doing nothing. The other man took Z.H.'s belongings. This court recognizes the fact that Petty was not charged with the robbery of Z.H. Its occurrence does, however, demonstrate Petty and Nigia's joint intent and participation in a common design or agreement to commit a robbery. Petty either pointed a gun at K.S. and requested his hat, or he took Z.H.'s belongings.

8

¶ 22    As for any conflicts and inconsistencies in the evidence, the trial court had the opportunity to view the witnesses' live testimony and resolve whatever conflicts and inconsistencies were in the evidence. In evaluating K.S.'s testimony, the trial court specifically noted it was apparent that K.S. did not want to point Petty out in trial and wanted to change his story.

¶ 23    Notwithstanding the evidence about how the robbery occurred, Petty's other actions show his intent and participation in a common scheme or agreement to commit armed robbery. At no time did Petty attempt to dissuade Nigia, report the robbery, or distance himself from Nigia. In fact, Petty did the opposite and maintained a close affiliation with his cohort after the commission of the crime. Both Petty and Nigia got into the Impala after the robbery and urged Martin to leave the scene. When Martin wrecked the car, both Petty and Nigia exited the rear passenger area of the car and fled on foot. Petty unsuccessfully hid from law enforcement while Nigia got away. Finally, the stolen items were found in the rear passenger area of the Impala from which Petty and Nigia exited and fled.

¶ 24    The evidence showed that Petty and Nigia shared the same criminal intent and engaged in a common scheme or agreement to commit armed robbery. It does not matter who did what for accountability purposes. There is no dispute that a robbery occurred wherein K.S.'s hat was taken. Petty and Nigia were both present and participating in the robbery making them responsible for each other's actions. See *Perez*, 189 Ill. 2d at 267. Therefore, Petty is liable for the armed robbery of K.S. via accountability.

¶ 25    After considering the evidence, the trial court found Petty guilty beyond a reasonable doubt of armed robbery via accountability. This court is not in a position where it may substitute its judgment for that of the trial court. This is especially true given the trial court's superior ability to evaluate the credibility of the witnesses' testimony at trial and resolve any conflicts and

9

inconsistencies in the evidence. After carefully reviewing the record, we cannot say that the trial court's findings and conclusions are so unreasonable or improbable to justify a reasonable doubt as to Petty's guilt via accountability.

¶ 26     For the foregoing reasons, we affirm Petty's conviction.


¶ 27     Affirmed.