2022 IL App (2d) 190979-U
No. 2-19-0979
Order filed March 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-30 |
| MARCO D. MOORE, | ) ) ) | Honorable Glenn R. Schorsch, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1     *Held*:   There was sufficient evidence to find defendant guilty beyond a reasonable doubt of aggravated battery with a firearm under an accountability theory, where prolonged pursuit of the victim's vehicle and ballistic evidence support the finding that defendant intentionally facilitated his passenger's shooting. Therefore, we affirm.

¶ 2     Defendant, Marco D. Moore, appeals his conviction of aggravated battery with a firearm

(720 ILCS 5/12–3.05(e)(1) (West Supp. 2017)) based on a theory of accountability. Defendant

argues that the State failed to prove him guilty of the crime beyond a reasonable doubt in that the

State failed to sufficiently prove his accountability for the actions of co-defendant Kahill Brown.

We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged with two counts of aggravated fleeing to elude a peace officer (625 ILCS 5/11-204.1(a)(1), (4) (West 2016)), two counts of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West Supp. 2017)), armed violence (720 ILCS 5/33A-2(a) (West 2016)), aggravated discharge of a firearm within 1,000 feet of a school (720 ILCS 5/24-1.2(a)(2) (West Supp. 2017)), and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West Supp. 2017)). A trial was held, wherein defendant was convicted of the enumerated charges, but the trial court after a hearing ultimately found that defendant had received ineffective assistance of counsel and granted him a new trial. A second, four-day bench trial was held on March 25 to 27 and April 10, 2019. Defendant was found guilty of two counts of aggravated fleeing, aggravated discharge of a firearm within 1000 feet of a school, and aggravated battery with a firearm. Defendant was sentenced to 10 years imprisonment.

¶ 5                              A. Shooting and Chase

¶ 6     On January 23, 2017, around 2:05 p.m., officers from the Freeport Police Department were in the area of Walnut Avenue and Broadway Street in Freeport, Illinois, having just executed a search warrant on a nearby residence. Officer Matthew Anderson was in his marked police SUV and Detective Timothy Krieger was in his unmarked tan police vehicle.

¶ 7     As they turned onto Broadway Street facing towards Walnut Avenue, they heard two or three gunshots followed by a brief pause and then another eight to ten shots. The sound seemed to come from just north of their location. Seconds later they observed a red Chevy Malibu followed closely by a black Chevy Tahoe traveling south on Walnut Avenue at a high rate of speed. They turned on their lights and sirens, turned onto Walnut Avenue and began to pursue the vehicles,

with the Malibu leading the chase followed by the Tahoe, then Krieger, then Anderson.

¶ 8       As the vehicles passed the intersection of Homer Street and Walnut Avenue, they were recorded by a security camera at the home of Issac Larmoreux. At that point in the chase, the Tahoe's windshield was intact and the front passenger side window was down. The security footage shows that after the vehicles passed Larmoreux's home, the Malibu's front passenger door was open slightly. Afterward, the Tahoe can be seen swerving slightly into the oncoming lane of traffic. As the vehicles passed the area of Walnut Avenue and American Street, the officers heard additional gunshots. Krieger saw that the shots were fired from the passenger side of one of the vehicles but could not tell from which vehicle they originated.

¶ 9       Approximately four blocks down the road, at the intersection of Walnut Avenue and Winnifred Street, the vehicles split up, with the Tahoe turning east on Winnifred Street and the Malibu continuing south on Walnut Avenue. Krieger turned off to pursue the Tahoe, while Anderson continued to follow the Malibu.

¶ 10      The Malibu made its way towards the intersection of Empire Street and Float Avenue where it slowed almost to a stop, and a passenger, who was later identified as John Carew, exited from the rear passenger door. The Malibu then turned east on Empire. Anderson looked to see if there was oncoming traffic and observed the Tahoe also traveling east on Empire Street still being pursued by Krieger and an additional marked police car. Anderson then radioed in the information regarding the direction of the Malibu, and got out of his SUV to approach Carew, who had collapsed in the grass. He handcuffed Carew, lifted his shirt, and saw two bullet holes in his lower back. Anderson called for an ambulance and stayed with Carew until it arrived.

¶ 11      The Tahoe pursued by Krieger turned south onto Oak Avenue from Winnifred Street, then east onto Garfield Street, north onto Chicago Avenue, east onto Fuller Street, and north onto

Carroll Avenue, before turning east onto Empire Street. At this point Officer Ryan Wagand, who was traveling east on Empire Street in his marked squad car, interposed himself between Krieger and the Tahoe. Two blocks down the Malibu pulled out from Float Avenue onto Empire Street in front of the Tahoe. Officer Anderson's squad camera captured the four vehicles as they drove past Float Avenue and Empire Street. The front passenger window of the Tahoe was down, revealing someone driving the vehicle. However, no one was visible in the front passenger seat.

¶ 12    At the intersection of Empire Street and Galena Avenue, the vehicles split up again. The Malibu, now pursued by Krieger, continued down Empire Street, while the Tahoe turned South onto Galena Avenue now with Wagand leading the pursuit.

¶ 13    Krieger pursued the Malibu on a circuitous route until it eventually came to a stop at Shawnee Street and Liberty Avenue. There were two occupants in the vehicle, Paris Williams and Damon Shipp, who were then taken into custody. Williams was taken from the driver's seat and Shipp from the front passenger seat. Officers discovered a .40-Caliber Ruger handgun on the driver seat floor.

¶ 14    Wagand continued to pursue the Tahoe south on Galena Avenue. The Tahoe then turned east onto U.S. Route 20, where it nearly collided with a passing semi-truck. Wagand briefly lost sight of the Tahoe as the semi-truck passed. This was the only point in the chase where the Tahoe was out of sight of the pursuing officers. Wagand then pursued the Tahoe east on U.S. Route 20 at speeds approaching 100 miles per hour. The Tahoe then turned north onto Rock City Road. As the Tahoe passed through the town of Ridott, Wagand observed something being thrown from the vehicle. The object was later recovered by Officer Douglas Hill and found to be a small bag containing cannabis. The Tahoe eventually crossed a bridge over the Pecatonica River at which point the Tahoe turned east onto East River Road. The Tahoe appeared to try to turn around but

ended up getting stuck in a ditch on the north bank of the river.

¶ 15    Wagand stopped on East River Road, exited his vehicle, and circled around it. At that point he observed persons exiting the passenger side of the vehicle. He drew his service weapon and ordered them to show their hands. Wagand testified that at the time he believed he saw three persons exiting the vehicle, but that he actually only saw two. Wagand saw one subject run south toward the river, and another subject running east into a copse of trees along the bank of the river. Then he saw the individual who had run toward the river return to the vehicle. Wagand chased after the individual running east, who turned out to be the defendant. As he was giving chase, Corporal Robyn Stovall passed him in her squad car. Wagand caught up to defendant approximately 100 yards from the Tahoe, where he surrendered. As Wagand caught up to defendant, he could be heard saying, "They got me. Police got me. I'm going to jail. Alright?" Defendant then threw his phone into the river, and Wagand and Stovall took defendant into custody. Wagand's and Stovall's squad cars were equipped with squad cameras, which recorded these events. Wagand wore a body camera which also captured the events.

¶ 16    Hill arrived at East River Road shortly after Wagand did. As he arrived, he observed Wagand pursuing defendant eastbound. He then observed Brown in the river up to his chest and ordered him to exit the water. As Brown was coming out of the water, Hill observed Brown had something in his right hand. Hill ordered Brown to drop it, which he did. Hill's squad car was equipped with a squad camera that captured the events.

¶ 17    As Wagand, Hill, and Stovall arrived at the scene, their squad cameras captured a white Chrysler traveling eastbound on East River Road pull out onto the southbound lane of Rock City Road, and then turn around and begin traveling west on East River Road. Stovall identified the vehicle as belonging to Tristan Euell, who defendant would identify as the owner of the Tahoe.

Detective Chris Schenberger also observed Euell and his white Chrysler traveling west on East River Road as he was traveling to the site where the Tahoe stopped.

¶ 18    Based on Wagand's belief that he had seen three people exit the Tahoe, police continued to search the area for a third person. However, no third person was located.

¶ 19                                    B. Physical Evidence

¶ 20    From the area of Walnut Avenue and Pleasant Street where the first round of shots was fired, officers recovered nine 9-millimeter shell casings from the west side of Walnut Avenue. Across the street on the eastern side of Walnut Avenue was a fence which formed the boundary of the playground of Aquin Elementary School. The 9-millimeter shell casing found furthest from the school was 58 feet away from the property. Officers recovered five .40-caliber shell casings from the area of Walnut Avenue and American Street, where the second round of shots had been fired.

¶ 21    After the chase, Krieger went to the area of 402 South Walnut and observed what he believed to be two bullet holes in the front siding of the home. 402 South Walnut faces Washington Place, which terminates at the intersection of Walnut Avenue, such that a vehicle traveling westbound on Washington Place would be facing towards 402 South Walnut. Krieger returned on February 1, 2017, and attempted to recover bullets from the home. The home was covered in siding, then foam board, then a thin layer of house wrap, and finally behind that was brick. Krieger removed the siding and foam board but recovered no bullets. Photographs of the holes and damage were admitted into evidence.

¶ 22    After defendant and Brown were taken into custody, officers located and recovered a set of car keys, a blue USB charging cord, and a plastic baggie corner with white powder. The parties stipulated that the baggie corner and its contents were sent to the Illinois State Police Rockford

Crime Lab for examination. The baggie corner was found to contain six smaller baggie corners, one with .5 grams of heroin and five which contained a total of 1.1 grams of cocaine.

¶ 23    The parties stipulated that Carew was taken to a hospital and treated for multiple gunshot wounds. Two bullets were removed from his body and given to an attending police officer. As a result of the gunshot wounds, one of Carew's kidneys had to be removed.

¶ 24    The parties stipulated that Crime Scene Investigator (CSI) Angela Matthews searched both the Tahoe and Malibu, which had been taken to the city maintenance yards. Matthews found defendant's driver's license on the driver's side floorboard of the Tahoe. Matthews identified seven defects in the rear of the Malibu which were consistent with bullet holes. Likewise, there were three defects in the rear interior of the trunk, which continued through the rear passenger seat into the interior of the vehicle consistent with bullets entering the interior of the vehicle. She identified which defects in the rear of the Malibu corresponded to those in the trunk's interior and from that formed the opinion that the bullets were fired in a left to right trajectory. Matthews also recovered a bullet from the inside of the trunk.

¶ 25    The parties stipulated that the recovered bullets, shell casings, and Ruger handgun were sent to the Illinois State Police Rockford Crime Lab for examination. The five .40-caliber shell casings recovered from the area of Walnut Avenue and American Street were determined to have been fired by the Ruger recovered from the Malibu. That bullet recovered from the Malibu and the two bullets recovered from Carew's body were found to have been fired by the same 9-millimeter caliber firearm and were not fired by the Ruger. The 9-millimeter shell casings recovered from the area of Walnut Avenue and Pleasant Street were found to have been fired by the same firearm and were also not fired by the Ruger.

¶ 26                                    C. Defendant's Statements

¶ 27    Defendant gave three different interviews with police but did not testify at trial. The first interview was with Stovall on January 23, 2017. Defendant stated that prior to the shooting, he and Brown had gone to Zay's store to get some nachos. Defendant was driving the Tahoe west on Iroquois Street, and as he crossed Galena Avenue, at the point where Washington Street and Iroquois Street merge into Washington Place,[1] is where he first saw the Malibu. The Malibu turned left onto Walnut Avenue from Washington Place. He knew three people were in the Malibu but did not know who they were. He then stopped at a stop sign at the intersection of Washington Place and Walnut Avenue to eat his nachos. Brown then urged him to turn left. Defendant was confused by Brown's insistence as he was just eating his nachos and not texting or doing anything illegal.

¶ 28    Defendant then turned left onto Walnut Avenue, and the rear passenger door of the Malibu opened up and someone fired several shots towards them. Neither the Malibu nor defendant's vehicle stopped. After passing Broadway Street, defendant became aware that Krieger and Anderson's vehicles were pursuing them. Brown urged defendant to keep going and he did so, driving straight down Walnut Avenue. In the area between Homer Street and American Street, the front passenger door of the Malibu opened and someone fired more shots at them. One of them went through the windshield of the Tahoe, causing defendant to swerve. He then described the path he took to get to East River Road. Immediately prior to his apprehension by police, Moore had been on the phone with his girlfriend, and he threw his phone into the river because he was mad.

---

[1] Defendant referred to this area as Pleasant Street, but based on his description of the area and subsequent statements to police, it is evident that he was referring to Washington Place.

¶ 29    Defendant stated that no one in the Tahoe had a gun and that no one in the Tahoe fired a gun. He fled because he panicked and because he thought that Brown had drugs on him. He was not directed where to go. He did not throw anything out of the vehicle. He did not know who was in the red vehicle.

¶ 30    At around 5:01 p.m. on January 23, 2017, Detective Tony Bradbury interviewed defendant. Defendant's account largely mirrored his previous interview with Stovall. The Tahoe belonged to Euell. Brown had asked if he would drive him around that day as Brown did not have a license. He agreed and Brown drove the Tahoe to defendant's house after which point defendant drove.

¶ 31    Defendant was incarcerated and charged. Afterward Bradbury received three phone calls that defendant wanted to speak with him.

¶ 32    On January 24, 2017, defendant gave a recorded statement to Bradbury and Krieger. The statement included more details than his previous statement and differed in several ways. Specifically, defendant said that he agreed to drive Brown around in the hopes that they would later smoke some weed together. When Brown arrived to pick defendant up, there was a third person in the Tahoe. Before purchasing their nachos, defendant first dropped this person off near Horizon Supermarket and then took Brown over to Illinois Street, where Brown exited the Tahoe to meet with someone. Defendant did not know what the meeting was about, but believed it to be a drug deal.

¶ 33    Regarding the shooting, defendant stated that after the Malibu initially fired at them near the area of Pleasant Street and Walnut Avenue, Brown produced a decent sized black automatic handgun from his person and fired at the Malibu out the passenger side window. Brown used his right hand as he had previously been shot 19 times and his left arm and leg did not move well. Defendant stated that he did not know Brown had a gun prior to the shooting. Brown had thrown

the gun out near U.S. Route 20 and Galena Avenue after the Tahoe almost collided with the semi-truck. Defendant did not know what the dispute was between Brown and the occupants of the Malibu which led to the shooting, but he had subsequently heard that it had to do with an ongoing issue between Shipp and Brown. Defendant's explanation for the changes in his statement was that initially he did not want to be labeled a snitch, but that he did not want to go to jail or be charged with something he did not do because he was not the shooter.

¶ 34    The trial court found defendant guilty of two counts of aggravated fleeing, aggravated discharge of a firearm within 1000 feet of a school, and aggravated battery with a firearm. Defendant was sentenced to 10 years imprisonment. Defendant timely appealed.

¶ 36                                    II. ANALYSIS

¶ 37     Defendant argues that the State failed to prove beyond a reasonable doubt that he was accountable for Brown shooting at the Malibu because it did not prove that defendant shared Brown's intent or that defendant and Brown shared a common criminal design.

¶ 38    When considering the sufficiency of the evidence, a reviewing court, viewing the evidence in the light most favorable to the State, must consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). A reviewing court will not substitute its judgment for that of the trier of fact on the credibility of witnesses or the weight of the evidence. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). The same standard applies whether the evidence is direct or circumstantial (*People v. Thomas*, 178 Ill. 2d 215, 232 (1997)), and whether there is a bench or jury trial (*People v. Howery*, 178 Ill. 2d 1, 38 (1997)). Therefore, a conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that it justified a reasonable doubt of the defendant's guilt. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 39    A person commits aggravated battery with a firearm when in committing a battery, he or she knowingly discharges a firearm and causes any injury to another person. 720 ILCS 5/12–3.05(e)(1) (West Supp. 2017). Defendant does not dispute that Brown committed aggravated battery with a firearm and challenges only the trial court's accountability finding.

¶ 40    "A person is legally accountable for the conduct of another when *** either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016). "Unless the accomplice *intends* to aid the commission of a crime, no guilt will attach." (Emphasis in original.) *People v. Shaw*, 186 Ill. 2d 301, 322 (1998). "To prove that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence which establishes beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Perez*, 189 Ill. 2d 254, 266 (2000).

¶ 41    The mere presence at the scene of a crime will not render a defendant accountable for the crime, even when joined with flight from the crime or knowledge of its commission. *Id.* at 268. However, flight may be considered as a factor in determining whether a defendant is accountable. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995).

¶ 42                                    A. Bullet Holes

¶ 43    As a preliminary matter we address defendant's argument that the trial court's ruling contradicted itself regarding the alleged bullet holes at 402 South Walnut Avenue. The trial court stated:

           "This Court does not find that enough evidence was presented to make that
       determination, that even though they were referred to as bullet holes throughout the

testimony, those round defects showed no penetration into the home at 402 South Walnut. There were no bullet fragments found. And the bullet holes that did enter the red Chevy Malibu were bullet holes that had penetrated metal.

This was a frame house on 402 South Walnut and again the Court does not find that those round defects were bullet holes."

Defendant maintains that the trial court contradicted itself when later, in finding that defendant shared Brown's intent to shoot, it considered a scenario in which the holes on 402 South Walnut Avenue were bullet holes stating,

"Let's look at this two ways. If the shots first came from Mr. Brown, and those round defects were actually gunshot holes, the only way that those shots could have been made was when the car was heading west and not heading south on Walnut.

When Mr. Moore turned the car left on Walnut to begin the chase, he engaged in the criminal activity that had been started by Mr. Brown."

Accordingly, defendant maintains that the trial court's hypothetical regarding the bullet holes should not be considered in determining whether the State met its burden of proving defendant guilty beyond a reasonable doubt.

¶ 44    We do not find that the trial court contradicted itself in rendering its ruling. At trial, the State and the defense set forth two theories explaining the initial two to three gunshots followed by another eight to ten shots as heard by Anderson and Krieger. The State argued that the first two to three shots were Brown firing in the direction of the Malibu before it turned onto Walnut Avenue, and then the eight to ten shots were Brown firing at the Malibu after turning the corner onto Walnut Avenue. Defendant argued that the first two to three shots were caused by someone in the Malibu firing at the Tahoe and the eight to ten shots were Brown returning fire. There was

no physical evidence in the form of bullets or shell casings to definitively prove either theory of the first two to three shots. In making its ruling the trial court considered both scenarios and their effect on defendant's accountability, ultimately determining that under either scenario defendant would have been accountable. This hypothetical exercise was done to examine the posited scenarios and was not a subsequent determination that the defects were in fact bullet holes. Accordingly, there was no contradiction as to this point.

¶ 45                              B. Shared Criminal Intent

¶ 46    Defendant argues that the facts of this case mirror those in *People v. Taylor* 186 Ill. 2d 439 (1999), and that the same reasoning should apply in this case. In *Taylor* the defendant was driving with his friend, who showed the defendant a handgun which he produced from his pocket. *Id.* They continued driving around, and after turning onto a narrow street, nearly collided with another vehicle. *Id.* at 442-43. The occupants of the other vehicle exited the vehicle, and one of them shouted a racial slur at the defendant and his friend. *Id.* at 443. The friend told the defendant to stop the car, and he exited and fired two shots in the general direction of the occupants of the other vehicle. *Id.* at 443-44. The friend then returned to the car, and the defendant drove away. *Id.* at 444. The *Taylor* court determined that the defendant could not be held accountable for the shooting because he neither knew his friend intended to shoot at the occupants of the other vehicle, nor did he make any effort to aid him in doing so. *Id.* at 448. Further, the unforeseeability and spontaneity of the traffic altercation militated against a finding that the defendant shared the friend's intent to shoot. *Id.* The court likewise held that because the defendant did not facilitate or intend to facilitate the shooting, and because escape was not an element of aggravated discharge, the defendant was not accountable for the shooting. *Id.* at 449.

¶ 47    The *Taylor* court heavily relied on *People v. Dennis*, 181 Ill. 2d 87 (1998). In *Dennis* the

defendant drove his companion to a drug house with the intent of purchasing heroin. *Id.* at 90. His companion exited the vehicle, and the defendant turned away from the drug house down an alley where he waited for his companion to return. *Id.* at 90-91. The defendant then saw his companion running towards the vehicle chased by an unknown man. *Id.* at 91. His companion entered the vehicle, and they drove away. *Id.* The defendant initially believed his companion had been fleeing a drug bust, but unbeknownst to the defendant, his companion had produced a gun and proceeded to rob two men in a pickup truck parked around the corner of the alley, taking a car radio/CD player. *Id.* The court held that because escape was not an element of armed robbery, the court's instruction that the activities involved in escaping could be considered as part of the offense was in error. *Id.* at 106-07

¶ 48    In *People v. Fernandez*, 2014 IL 115527, our supreme court evaluated the holdings in *Dennis* and *Taylor* and clarified that they addressed the shared intent category of accountability and that both cases stand for the principle that one cannot share the intent to promote or facilitate the commission of a crime when one does not know that a crime is going to be committed. *Id.* ¶ 20. This is not the rule for common design cases, which is where one aids another in the planning or commission of an offense, they are legally accountable for any criminal act by the person he aids which is done in furtherance of the planned and intended act. *Id.* ¶ 21; *People v. Kessler*, 57 Ill.2d 493, 497 (1974).

¶ 49    We find that the facts in this case are distinguishable from those in *Taylor* and *Dennis* in several respects. In both of those cases the principal exited the vehicle and committed the offense largely outside the presence of the driver, such that the drivers had limited opportunity to either help or hinder their compatriots' misdeeds. In both cases the victims were random with no previous connections to the defendants or their companions. Finally, the escapes immediately took the

parties away from the victims, such that there was no chance of further harm being meted upon them.

¶ 50    Whereas in the instant case, defendant was in the vehicle with Brown when the shots were fired and had the opportunity to help or hinder Brown's actions. Further, while defendant argues the encounter occurred by happenstance, Brown did have some kind of history with Shipp which makes the accompanying violence more foreseeable and less spontaneous. Finally, a significant portion of defendant and Brown's attempted escape consisted of defendant driving the Tahoe while closely following the Malibu which the trier of fact could consider to be an active pursuit of the Malibu.

¶ 51    Indeed, that is the most singular aspect of these facts. But for the officers' presence, the act of following the Malibu would clearly evidence an intent on defendant's part to assist in Brown's assault on the vehicle. Alternatively stated, the officers' presence gives defendant the plausible argument that his sole concern was evading the police, and his apparent pursuit of the Malibu was really flight from the police, which was the argument he made in his statements to the police.

¶ 52    However, this argument is belied by other factors. First, Anderson and Krieger were in the area of Broadway Street and Walnut Avenue prior to the chase. Defendant had to drive from Washington Place and Walnut Avenue, past Pleasant Street and then Broadway Street before the police had the opportunity to get behind them. By the time defendant passed Broadway Street, the Tahoe was traveling at speeds between 40 and 50 miles per hour, between one and three car lengths behind the Malibu. This shows that defendant's pursuit of the Malibu began prior to the police's intervention and cannot be excused as mere flight from the police. Second, defendant continued to pursue the Malibu for 11 blocks before giving up his pursuit. During that time defendant followed the Malibu so closely that Shipp felt either endangered or enraged enough to fire at least five shots

at the pursuing Tahoe, despite the presence of police. The trial court found that "it was not until the bullet crashed directly through [ defendant's] windshield and whizzed by [his] head, nearly missing killing [him] that [he] stopped that chase." However, even that is too generous. It was not until four blocks later that defendant eventually gave up pursuit of the Malibu. From all this it is not unreasonable to conclude that defendant's pursuit of the Malibu was not merely coincidental with his fleeing, but rather was executed with ill intent.

¶ 53    However, as defendant correctly points out, by the time police observed defendant's pursuit of the Malibu, the offense of aggravated battery was complete, and no further crimes other than those related to the fleeing occurred. As to what occurred prior to the police's involvement, we only have defendant's word. Defendant stated that he did not know Brown had a gun until Brown produced it to return fire at the Malibu, and that after Brown fired his gun, defendant was driving to evade the police. Therefore, defendant maintains that the State failed to prove him accountable beyond a reasonable doubt. However, criminal intent may, and often must be proven by circumstantial evidence. *People v. Johnson*, 2019 IL 123318, ¶ 25.

¶ 54    There are several flaws in defendant's version of events. First, defendant admitted to lying in his first two statements to the police, which negatively affected his credibility. Second, as discussed previously, it can reasonably be inferred that defendant's pursuit of the Malibu was intentional. It can further be inferred by the rate of speed at which the vehicles crossed Broadway Street, and their proximity to Walnut Avenue and Pleasant Street, that defendant's pursuit of the Malibu had to begin near that area, and possibly prior to Brown's shooting. This is bolstered by the ballistic evidence which showed that the shots were fired in a left to right trajectory, which means that in order for the shots to have been fired out of the passenger side window, the Tahoe would have had to have been significantly left of the Malibu, likely over the centerline of the road.

Together, from the ballistic evidence and pursuit of the Malibu, a rational trier of fact could have concluded that defendant shared Brown's intent to fire at the Malibu and facilitated the shooting by positioning the car in a manner which favored Brown's aim. See *People v. Salazar*, 2014 IL App (2d) 130047, ¶ 57 (The defendant was accountable where he aided in the commission of a shooting by piloting his vehicle in a manner which facilitated the passenger's shooting.).

¶ 55                                    C. Common Criminal Design

¶ 56    We also find that defendant could be found accountable under a common criminal design theory. "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.'" *Fernandez*, 2014 IL 115527, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)). Words of agreement are not necessary to establish a common criminal design, and accountability may be established through a defendant's knowledge of and participation in the criminal scheme, even where the defendant did not directly participate in the crime itself. *Perez*, 189 Ill. 2d at 267. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. Where one aids another in the planning *or commission* of an offense, they are legally accountable for any criminal act by the person he aids which is done in furtherance of the planned and intended act. *Fernandez*, 2014 IL 115527, ¶ 21; *Kessler*, 57 Ill.2d at 497.

¶ 57    As previously discussed, from defendant's pursuit of the Malibu and the ballistic evidence a rational trier of fact could conclude that defendant intentionally aided Brown in the commission of the shooting. This is enough to find accountability under a common criminal design theory.

¶ 58    However, there is additional circumstantial evidence which speaks to a common criminal design. "Proof that the defendant was present during the perpetration of the offense, that he fled from the scene, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime" are factors which may be considered in determining accountability. *Perez,* 189 Ill. 2d at 267. Defendant was present during the shooting, d defendant drove the vehicle in the direction of the Malibu, defendant fled with Brown, and while defendant's opportunity to dissociate himself from Brown or report the crime were limited by his swift apprehension, it could be argued that defendant's first attempts to deny that anyone in the Tahoe had or shot a gun both demonstrate an attempt to maintain an alliance with Brown and constitute a failure to report what defendant knew about the crime. Additionally, defendant said he threw his phone into the river, ostensibly out of anger, but perhaps with the intent of destroying evidence. See *People v. Price*, 2021 IL App (4th) 190043, ¶ 127 (Destruction of evidence is admissible for the purpose of showing consciousness of guilt.). Therefore, a rational trier of fact could have found defendant accountable for the shooting beyond a reasonable doubt based on a common criminal design theory.

¶ 59                                III. CONCLUSION

¶ 60    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 61    Affirmed.