NOTICE

Decision filed 11/27/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220461-U

NO. 5-22-0461

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Richland County. |
| | ) | |
| v. | ) | No. 20-CF-169 |
| | ) | |
| TARA N. HAWS, | ) | Honorable |
| | ) | Matthew J. Hartrich, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MOORE delivered the judgment of the court.
Justices Vaughan and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the defendant's conviction and sentence for first degree murder via accountability because there was sufficient evidence presented to sustain her conviction. Additionally, plain-error review is inapplicable to her allegations of error resulting from the trial court's answer to a jury question, and she received effective assistance of counsel.

¶ 2   Following a jury trial, the defendant, Tara N. Haws, was convicted of one count of first degree murder via accountability. The trial court sentenced her to 50 years in the Illinois Department of Corrections. On appeal, Haws raises two main issues. First, she challenges the sufficiency of the evidence to convict her at trial. Second, she alleges that she did not receive a fair trial due to the trial court's answer to a jury question. She alleges her trial counsel was ineffective for acquiescing to the trial court's response to the jury's request for transcripts, that this was plain error, and she was prejudiced as a result. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     On September 9, 2020, Haws was charged, by information, with one count of first degree murder pursuant to Illinois's accountability statute. The information alleged that the defendant on or about September 6, 2020, without lawful justification and with the intent to kill or create great bodily harm to Kyle M. Johnson, shot Kyle M. Johnson with a gun, thereby causing the death of Kyle M. Johnson.

¶ 5     Thereafter, Haws was charged, by subsequent information filed on October 8, 2020, with three additional counts of first degree murder via accountability and one count of conspiracy to commit first degree murder. Count II alleged that on or about September 6, 2020, the defendant, or one for whom she was accountable, without lawful justification and with the intent to kill Kyle M. Johnson, discharged a firearm at Kyle M. Johnson, thereby causing the death of Kyle M. Johnson. Count III alleged that on or about September 6, 2020, the defendant, or one for whom she was accountable, without lawful justification discharged a firearm at Kyle M. Johnson, knowing such act would cause death to Kyle M. Johnson, thereby causing the death of Kyle M. Johnson. Count IV alleged that on or about September 6, 2020, the defendant, or one for whom she was accountable, without lawful justification discharged a firearm at Kyle M. Johnson, knowing such act created a strong probability of death or great bodily harm to Kyle M. Johnson, thereby causing the death of Kyle M. Johnson. Count V alleged that on or about September 6, 2020, the defendant, with the intent that the first degree murder of Kyle M. Johnson be committed, agreed with K.A. and Rick Meador to the commission of first degree murder as alleged in counts II, III, and IV.

¶ 6     The defendant's jury trial commenced on March 14, 2022. The following pertinent facts were gleaned from the evidence produced at trial.

¶ 7 On September 6, 2020, at approximately 5 a.m., Rick Meador shot and killed Kyle Johnson. Meador pled guilty to Johnson's murder. As part of Meador's plea agreement, while he awaited sentencing, he agreed to testify truthfully at any case arising from the shooting.

¶ 8 Meador was dating and living with K.A., who was 16 at the time of the murder. They lived with her father, Michael Troy Arnone, at his home in Olney. Haws is K.A.'s mother. Haws did not live with Arnone and K.A.; however, she frequently visited the home to see the three children she shared with Arnone.

¶ 9 Meador testified that prior to September 5, 2020, he had met Johnson once or twice before but did not know him personally. Meador believed that Johnson had raped K.A. two years ago. Meador testified that a few months before September, he made an offer to a few people to pay them from $200 to $500 to beat Johnson because of the history between K.A. and Johnson. On the night of September 5, 2020, Haws took Meador up on his offer to beat up Johnson.

¶ 10 Meador testified that Haws's plan was to meet Johnson, give him Xanax, and let him pass out. At that point, Meador was to join Haws for the beating. He testified that Haws texted Johnson to set up a pill deal. While the planning was underway, Dale Boatman and William Sky Weatherford arrived at Arnone's home. Meador testified that the discussions regarding the plan to beat Johnson occurred in the living room of the Arnone home as well as Meador and K.A.'s bedroom. Those present during the conversations included Haws, Meador, K.A., Boatman, and Weatherford.

¶ 11 Meador thought Haws's plan was a "stupid idea; that was not going to work." This led to the development of a new plan. The new plan was to meet Johnson at the Save-A-Lot grocery store, and Meador would confront Johnson there.

¶ 12    Haws left the Arnone home first. She was riding a bicycle. Meador, Boatman, and Weatherford followed on foot and hid in an alley. Instead of Johnson arriving to meet Haws, Geshaun Williams arrived. Meador testified that he thought it was Johnson, so he went to confront him. At that time, Williams took off running and ran out of his shoes. Meador picked up the shoes and returned to Arnone's house with them.

¶ 13    Meador testified that Boatman arrived to the Arnone house about 10 to 20 minutes after he did and that he had been screamed at and told "white boy, better run," while having a pistol waved at him. Meador testified that he was afraid that they were going to come to his back yard and attack him, so he and Boatman decided they "should bring out the guns just in case." Meador took a 9-millimeter rifle and a 9-millimeter pistol from his closet. Meador kept the rifle and gave Boatman the pistol.

¶ 14    Then, a second meeting was arranged. Meador testified that Haws had been texting Johnson to arrange a meeting so Williams could get his shoes back. Meador testified that Haws told him that Johnson wanted "for them to bring their people and for us to bring our people." He testified that he, Haws, K.A., and Boatman were on the back porch of the Arnone home, but he could not remember the details of any conversations had on the back porch. He and Boatman were armed.

¶ 15    The group of Meador, Haws, K.A., and Boatman then got into a car to drive to a meeting with Johnson. Meador testified that when they left the house, Haws was driving, K.A. was in the front passenger seat, Boatman was in the rear left seat, behind the driver, and he was in the rear right seat. The group traveled towards Walnut Street in Olney to meet Johnson. Meador testified that the car was stopped near the fire station so K.A. could take over driving because "[s]he thought her mom was inadequate [*sic*] enough to do it." When the vehicle was stopped, Meador and Boatman exited the vehicle. Boatman walked towards the alley. Meador exited the vehicle and

was holding the rifle. He testified that he was told to get back into the car instead of standing in the street with a rifle in his hands. Meador returned to the vehicle.

¶ 16    K.A. was now driving the vehicle, Haws was in the front passenger seat, and Meador was located in the right rear seat. K.A. turned the vehicle around and drove it down Walnut Street toward Johnson. Meador testified, "I told them to slow down, and that is when I had my window rolled down already, and I pointed the rifle at him, therefore firing upon him." Meador fired all 12 rounds that were in the rifle.

¶ 17    Meador testified that he closed his eyes and shot without aiming at Johnson. He added that he "couldn't tell you a single thing [he] was thinking at that moment." He stated he did not intend to shoot Johnson, but that is what happened.

¶ 18    Meador testified that after the shooting there was an "eerie silence" in the vehicle, and they immediately returned to the Arnone home. Upon arriving to the Arnone home, Meador asked a neighbor to hide the rifle. He and K.A. then packed to leave town. He paid Haws $50 prior to leaving town.

¶ 19    Weatherford testified that he was at the Arnone home on September 5, 2020. He testified that his sister, Haws, asked if he wanted to help when she met Johnson. Weatherford thought Haws and Meador were angry towards Johnson because of the allegation that he raped K.A., so he planned to go along to break things up, if necessary. Weatherford went with the group to the first meeting, but Johnson was not there. He then returned to the Arnone house. He testified that upon the return to the house, the anger "amped up." Weatherford testified that guns were being discussed when the group was towards the back of the Arnone house. He testified that when the group left for the second meeting that he did not go because they were "bringing up guns."

5

¶ 20    Shawn Jones testified that he was near the Save-A-Lot on the night of September 5, 2020. He testified that he was riding his bicycle in the area looking for his wife. While he was riding his bicycle, he saw Haws sitting beside the telephone pole on Butler Street by the parking lot. He testified he has known Haws since she was a child, so he stopped to greet her. He testified that she rode her bicycle in front of Save-A-Lot and asked if he had "seen an old boy." He testified she showed him a picture of an African-American man with blonde tips on his hair. Jones recognized this person as being one of his neighbors and told Haws that he had not seen him. Jones later learned the man was Johnson. Jones saw three people coming down the road and recognized one of them as Boatman, the father of his grandchildren. He testified he said "hi" and then proceeded to ride away on his bicycle.

¶ 21    Michael Troy Arnone testified that on the night of September 5, 2020, he was drinking beer at his home with his friends, Merle Gaither and Kenny Dallmier. That evening, Haws was also present at his house. It was not unusual for Haws to be at the house.

¶ 22    Arnone testified that he "knew she was—they were going to fight somebody." He also testified that he remembered Haws receiving a phone call after returning to the house. He then testified that she left a second time after the phone call.

¶ 23    Kenneth Dallmier testified that he was at Arnone's house on the night of September 5, 2020. He testified that he was hanging out with Arnone and Gaither, but that he saw several people in and out of the house that night. He saw Weatherford, Haws, and Meador, and believed that K.A. was also present in the house, but sleeping.

¶ 24    Dallmier testified that throughout the night he remembered "some malicious talk, but [he] never knew who it was directed towards." He testified he heard some "malicious talk over a phone call," and further described it as "just anger." He knew Haws was on the phone, but did not know

6

who she was speaking to. Dallmier testified that Haws came and asked Arnone for a weapon "[l]ike to melee, to hit somebody with."

¶ 25 Dallmier testified that he recalled people leaving on a couple different occasions because "there was a bunch of commotion, bunch of talk." He testified that the going and coming happened over a very short period of time.

¶ 26 Kelsey Hupp testified that she had been dating Johnson for more than two years, and was living with him prior to his death. She testified that she had been working at Casey's gas station into the early morning hours of September 6, 2020. Johnson and Williams came to Casey's at approximately 3:30 a.m. to walk her home. As they were walking home, she testified that she saw a person on a bicycle, she saw the person's face but did not know them, and she later learned this person was Haws. She also saw two other people walking down an alley. She testified that Johnson told Williams to go talk to Haws while he continued walking her home. After Hupp and Johnson arrived home, she testified that Williams arrived running down the alley without shoes.

¶ 27 Then, the three of them sat on the porch. She observed Johnson and Williams texting on Johnson's phone. Hupp testified that she saw Haws's name on the messages. After texting for about 10 to 15 minutes, Williams and Johnson left the house. Hupp started to go with Williams and Johnson, but Johnson told her to stay home, so she started walking back home.

¶ 28 She testified that "a couple minutes later, I saw the car go back down and pull into Laurel Street and then back off and turned back down Walnut Street the way they had came [*sic*] from, and then after that is when I heard the gunshots."

¶ 29 Michael Jennings was called to testify. He testified he had a relationship with Haws because he had previously dated her mother. Despite that relationship ending, he still had a father-daughter-type relationship with Haws.

7

¶ 30    Jennings testified that he received a call from Haws on September 6, 2020, asking for a ride. He agreed and picked Haws up at approximately 9:30 a.m. from Earl Tanahill's home. Jennings testified that when Haws got into his vehicle "[s]he said that they had killed a guy." Jennings was asked if he remembered Haws's exact words. He testified that "[p]retty much that was it. She blurted it out and told me they had killed a guy." Jennings testified that he did not follow up on the statement because he did not really believe it.

¶ 31    Jennings and Haws stopped at his house for a few minutes. At that time, she told Jennings who had been involved. She told him about Meador and K.A., but refused to give him the name of the fourth person.

¶ 32    Jennings met with Haws again on September 7, 2020. He testified that at that time "she more or less recanted. Didn't want to talk about it. If I asked a question, she kind of smirked or smiled and looked the other way."

¶ 33    On cross-examination, Jennings was asked about when he picked Haws up on September 6, 2020. The following exchange took place:

"Q. And so—so, as you said—you said that day when—that Sunday, you picked Tara up, she got in the car and just kind of—

A. Kind of blurted it out.

Q. —kind of blurted it out, and she said, They shot a guy?

A. Yeah."

¶ 34    Haws testified on her own behalf. Haws testified that prior to September 6, 2020, she was to meet Johnson "to trade her Xanax for a bag of weed." She testified that she did not know Johnson, had never met Johnson, and had never even seen Johnson. She testified the meeting to exchange drugs came about because Johnson had responded to an ad she had for a car for sale.

During this first contact, she mentioned she had Xanax if he ever wanted to trade or buy any. These initial messages were exchanged via Facebook Messenger.

¶ 35 Haws testified that on September 5, 2020, Johnson was to meet her at the Save-A-Lot parking lot around 4 a.m. or 5 a.m. to trade Xanax for marijuana. She testified the meeting was to take place at that time because she slept during the day.

¶ 36 Haws testified that she had been at Arnone's house to visit her children. She stated that several people were at the house including Arnone, Meador, K.A., Gaither, and her brother, Weatherford. She testified that Arnone and his friends were on the front porch, K.A. and Meador were in their room, and Haws was in the living room.

¶ 37 Before the scheduled meeting, Haws testified that she asked Meador if he knew Johnson. She testified that she had seen Johnson's Facebook profile picture showing him holding guns, so she wanted to find out more about Johnson. She testified that Meador told her "well, that's—that's the guy that raped your daughter." Haws testified she did not know Johnson was who K.A. said had raped her two years earlier.

¶ 38 Haws testified that she was getting ready to go meet Johnson. She testified that no one went with her. She rode her bicycle to the meeting. Haws testified that she saw Jones before she arrived at her planned meeting. She stated she said "hey, I'll meet up with you after I meet up with this guy and do some business with him." She denied telling him she was waiting to meet somebody and denied having a phone on her to show him.

¶ 39 When she arrived at the meeting, she met a man and learned it was Williams instead of Johnson. She testified that she had only seen Johnson in "a picture on Facebook with him holding the guns." She testified that Williams asked her to go down the alley with him, but she did not.

9

She testified at that point "[Meador] and the other two showed up." She testified as Meador walked up towards her and Williams, that Williams took off running.

¶ 40 Haws testified that Williams ran out of his shoes, and Meador picked them up. She told Weatherford to take her bicycle "in case they started chasing him." Then, "we all—well, they walked back, and I walked—I walked back, too, but a little bit after them, maybe a couple minutes after them. Well, they took off running, basically, and I just walked ***."

¶ 41 Haws testified that she returned to Arnone's house at approximately 5:10 a.m. She recalled seeing Meador and Weatherford there but did not recall if Boatman was there.

¶ 42 She testified that upon her return to the Arnone house, she sat on the couch and drank a beer. She did not remember seeing Meador or Weatherford for a while. She testified that she received a call from either Williams or Johnson asking to meet up to give Williams his shoes back. Haws testified that she was going to walk to the meeting to return the shoes, but Meador offered her a ride instead.

¶ 43 Haws testified that her daughter, K.A., had been awakened and she was going to drive the car to the meeting. Haws testified that she was in the front passenger seat, and Boatman was in the rear behind the driver and Meador was behind her in the rear passenger seat.

¶ 44 Haws testified that she did not hear any conversations about guns. She testified that she did not see Meador get a gun. Haws testified that she did not see Meador holding a rifle when he was in the back seat of the car.

¶ 45 Haws testified that the following occurred once they arrived at the meeting:

"A. Well, we get there, and we see [Johnson] instead of [Williams]—well, they did. I didn't see them because my—my seat was leaned back. And they said, well, there's [Johnson]. So I was getting ready to get out of the vehicle to give them the shoes, and

10

instead Boatman and Ricky get out. And I was just, like, I am dumbfounded. I don't know why—what was going on.

Q. At that point, when you get out of the vehicle, did you see that they had guns?

A. No, I didn't know it.

Q. Okay. So do they get back in the vehicle?

A. [Meador] did.

Q. Did [Boatman] get back in?

A. [Boatman] took off running.

Q. Okay. So then what happened?

A. Then my daughter turned the vehicle around, and I started hearing the shot— the shots going off, the bullets, whatever, and I curled in a ball and just tried to block everything out."

¶ 46    Haws testified that after the shots were fired, her daughter drove home. After they returned to the house, Haws testified that she asked a friend to pick her up. She testified that Meador and K.A. started packing things to leave town. She testified that Meador paid her $50 for the Xanax she sold him earlier that day.

¶ 47    Haws testified that after going to a different friend's house, she called Michael Jennings. She testified that when Jennings picked her up she "told him that they shot [Johnson]."

¶ 48    On cross-examination, Haws was asked if she knew that Meador had marijuana. She testified that she knew that, but she wanted to trade with Johnson for a different kind. She also testified that her brother, Weatherford, was a "pathological liar," and that is why his testimony of the events of the evening was incorrect.

¶ 49 Haws's testimony completed her case, and closing arguments were given. During the State's closing argument, the jury was told that Haws's first words to Jennings were, "We killed a guy last night." The defense argued that the State had misremembered Jennings' testimony and stated in closing:

> "So my recollection—and this just happened yesterday—I'm confident that Michael Jennings said Tara said, They shot him. *** So I guess the point of that is just I'm just trying to illustrate—I'm not calling anybody a liar here, but I do think these witnesses weren't exactly in their right mind that night, didn't exactly know what was going on, and then today here, they're doing their best to tell you or not tell you, because, one, I don't think any one of these people want to get in trouble."

¶ 50 After jury deliberations began, the jury requested a transcript of Michael Jennings' testimony, a transcript of a crime scene investigator's testimony, and photograph exhibits. The trial court asked the State for its position on the jury's requests, and the State responded, "I have no problem providing any of the items other than the transcripts, which, as the Court is aware, should not be provided to the jury in order to not overemphasize particular evidence." The trial court asked defense counsel for her position, and defense counsel objected to the court providing the exhibits but did not comment on the request for transcripts. The trial court discussed the note it planned to send to the jury, and defense counsel did not comment. The trial court sent the following response to the jury, "The Court is not allowed to provide transcripts of testimony of any specific witness." The trial court did provide the requested exhibits to the jury.

¶ 51 The jury completed its deliberations and found Haws guilty of first degree murder. Following a sentencing hearing, Haws was sentenced to 50 years in prison. Haws filed a motion to reconsider her sentence, which was denied. Her timely notice of appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53                            A. Sufficiency of the Evidence

¶ 54    Haws first challenges the sufficiency of the evidence to support her conviction for first degree murder via accountability. She argues the State did not prove that she shared an intent to kill Johnson. Further, she argues that Meador's killing of Johnson did not further a common criminal design. We disagree.

¶ 55    "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When presented with a challenge to the sufficiency of the evidence, the reviewing court does not retry the defendant. *Id.* As the United States Supreme Court held in *Jackson v. Virginia*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) 443 U.S. 307, 319 (1979).

¶ 56    It is well settled that the responsibility to assess the credibility of the witnesses and the weight to be given to their testimony, to resolve conflicts or inconsistencies in the evidence, and to draw all reasonable inferences from the evidence rests with the trier of fact. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). A reviewing court has the duty to "carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011).

¶ 57    Under Illinois law, an individual is legally accountable for another's criminal actions when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the

13

planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2020). To prove a defendant possessed the intent to promote or facilitate an offense, the State must present evidence which establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal or there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). "Intent may be inferred from the character of the defendant's acts as well as the circumstances surrounding the commission of the offense." *Id.* Words of agreement are not required to establish a common purpose to commit a crime. *Id.* at 267. Proof that the defendant was present during the perpetration of the offense, that he or she fled from the scene, that he or she maintained a close affiliation with his or her companions after the commission of the crime, and that he or she failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. *Id.*

¶ 58    In her brief before this court, the defendant argues that the evidence, when viewed in the light most favorable to the State, showed that Haws believed Meador was going to beat Johnson. She argues that Meador's act of shooting Johnson was spontaneous, unplanned, and inexplicable. Haws argues that even if she knew Meador was armed, the State failed to prove that Meador intended to kill Johnson, so she cannot be accountable for what Meador had no intention of doing. Haws further argues that the shooting death of Johnson did not further the intended plan of beating him. Haws argues that the Illinois Supreme Court case of *People v. Fernandez*, 2014 IL 115527, supports her argument that since the shooting did not further the intended plan of beating the victim, she cannot be found accountable for Meador's actions. We disagree.

¶ 59    The *Fernandez* court looked to another Illinois Supreme Court decision in *People v. Kessler*, 57 Ill. 2d 493 (1974), and found no material distinction between the facts of *Kessler* and those of *Fernandez*. In examining *Kessler*, the Illinois Supreme Court found, "once Kessler agreed

14

to participate in burglary, he was liable under section 5-2(c) for every criminal act committed 'in connection therewith,' including the unplanned shootings committed by his initially unarmed companions." *Fernandez*, 2014 IL 115527, ¶ 16. Further, "[a] conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000).

¶ 60　　The evidence in Haws's trial did not show that Meador acted alone while she stood idly in surprise. Haws testified that she arranged an initial meeting with Johnson to commit an illegal drug transaction. She denies the initial meeting was to beat Johnson; however, there was testimony from several individuals that this was in fact the plan. Once the first meeting was unsuccessful, Haws arranged for a second meeting regarding Williams's shoes. Haws denied any knowledge that Meador had a rifle; but again, there is testimony from several individuals that the "guns were brought out" and taken to the second meeting. Like in *Fernandez* and *Kessler*, Haws is accountable for the unplanned shooting and killing of Johnson. After carefully reviewing the record, we cannot say that the trier of fact's findings and conclusions were so unreasonable or improbable to justify a reasonable doubt as to Haws's guilt via accountability.

¶ 61　　　　　　　　　B. Failure to Provide Transcripts to Jury

¶ 62　　On appeal, Haws contends that she did not receive a fair trial because the trial court did not provide the transcripts requested by the jury due to the trial court's incorrect belief that transcripts cannot be provided to the jury. Haws's trial counsel did not present an argument for or against providing or not providing the requested transcripts to the jury. When the trial court presented its proposed response to the jury, Haws's trial counsel acquiesced to the trial court's response. This alleged error was not raised in a posttrial motion, and therefore the contention of error is subject to the principles of forfeiture. Haws argues that the error should be preserved under the plain-error

15

doctrine, and that in any case, the failure to object to the trial court's response and urge that the transcripts be provided to the jury constituted ineffective assistance of counsel. The State contends that the plain-error doctrine cannot save Haws in this case due to invited error, and that Haws cannot demonstrate ineffective assistance of counsel. We agree with the State.

¶ 63    The plain-error doctrine is a mechanism that allows a defendant, in certain cases, to avoid forfeiture and allows a reviewing court to consider an unpreserved contention of error if "the evidence is close, regardless of the seriousness of the error," or if "the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). However, the invited-error doctrine creates an estoppel which precludes plain-error analysis. *People v. Holloway*, 2019 IL App (2d) 170551, ¶ 44. The invited-error doctrine applies when a party induced the court to act or consented to the court's action. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "When a defendant acquiesces in the trial court's answer to a question from the jury, the defendant cannot later complain that the trial court's answer was an abuse of discretion." *People v. Averett*, 237 Ill. 2d 1, 23-24 (2010).

¶ 64    In this case, we agree with the State. Haws acquiesced to the trial court's response to the jury's question in this matter. She cannot now complain of this error.

¶ 65    We now turn to the allegations of ineffective assistance of counsel. We review a claim of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15. Allegations of ineffective assistance of counsel are reviewed pursuant to the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Cathey*, 2012 IL 111746, ¶ 23. For a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

16

*Strickland*, 466 U.S. at 694. To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Id.* at 687-88. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). The defendant's failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 66 Pursuant to the first prong, a defendant must show deficient performance, which requires a showing that defense counsel made errors that were so serious that they prevented counsel from functioning as the counsel guaranteed to criminal defendants by the sixth amendment to the United States Constitution. *People v. Pecoraro*, 175 Ill. 2d 294, 319 (1997). This requires a defendant to show that defense counsel's performance fell below an objective standard of reasonableness. *Id.* This court's scrutiny of counsel's performance is highly deferential, and we indulge a strong presumption that counsel's performance did in fact fall within the wide range of reasonable professional assistance. *Id.* Because we do so, the defendant must rebut the presumption that, under the particular circumstances of the case in question, the challenged action might have been the product of sound trial strategy. *Id.* at 319-20. "Any evaluation of counsel's conduct cannot properly extend into matters involving the exercise of judgment, trial tactics, or strategy." *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000).

¶ 67 With respect to the prejudice prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Errors by counsel "come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "In assessing prejudice under *Strickland*, the question is not whether a court can be

17

certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Rather, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.*

¶ 68    Additionally, *Strickland* requires the defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Strickland*, 466 U.S. at 693. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81. The "defendant's burden is not to show that a different verdict was likely in the absence of counsel's shortcomings." *People v. Lefler*, 294 Ill. App. 3d 305, 312, (1998). Instead, we ask if, in the presence of the alleged shortcomings, the defendant "received a fair trial," which in this context means "a trial resulting in a verdict worthy of confidence." *Id.*

¶ 69    With respect to the first prong, we find that counsel's decision not to urge the trial court to supply the transcript of Michael Jennings to the jury to be a matter of judgment and trial strategy. During closing arguments, some focus was drawn to Jennings' testimony about whether he remembered Haws saying, "They shot a guy," or "we shot a guy." Defense counsel used this inconsistency to point out that people's memories of the same event can differ. Defense counsel might have made the decision not to provide the transcript to the jury because the final question that Jennings answered was:

> "Q. And, again, she admitted that she was involved with this homicide?
>
> A. Correct."

¶ 70    Assuming *arguendo* Haws could establish the first prong, we will review the second prong —prejudice. Haws contends that the evidence adduced at trial was insufficient to sustain her

18

conviction, or at the very least, close. On appeal she does not argue anything to affirmatively prove that prejudice resulted from the alleged error.

¶ 71    Following a comprehensive review of the record as a whole, we conclude that Haws has not affirmatively proven that her conviction would have been different but for the claimed error. Accordingly, we find that Haws received effective assistance of counsel.

¶ 72                                    III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 74    Affirmed.